STATE EX REL. EKERN, Attorney General, and another, Plaintiffs, vs. ZIMMERMAN, Secretary of State, Defendant.

*May 15—June 2, 1925.*

*Constitutional law: Amendments to constitution: How construed: General intent: Form and manner of submission to people: Sufficiency: Mandatory character of constitutional provisions: Judicial notice: Development of transportation by automobiles: Highways: Forestry amendment of 1924: Limitation of appropriation.*

1.  Amendments to a state constitution are to be construed so as to promote the objects for which they were framed and adopted. The intent is to be ascertained not alone by considering specific parts, but by ascertaining the general purpose of the whole, in view of the evil existing and the remedy sought to be applied; and when the intent of the whole is ascertained, no part is to be construed so that the general purpose shall be thwarted. p. 184.
2.  The courts will take judicial notice that in 1905 it was quite generally realized that, in order to successfully operate the automobile, a better highway system would be required, and that sec. 10, art. VIII, Const., limiting assessments for highway purposes, required amendment. p. 186.
3.  The people of the state, in view of the extent with which questions of public interest are discussed and the agencies devoted to the education of the masses on pending questions of public welfare, are, more than ever before, presumed to be familiar with the elements of the constitution and with the laws. p. 192.
4.  Sec. 2, ch. 30, Laws of 1925, appropriating $1,000,000 for highway purposes in addition to the gasoline tax imposed by ch. 11, Laws of 1925, and the motor vehicle license fees under sec. 85.04, Stats., is valid under sec. 10, art. VIII, Const., as amended in 1908, and not subject to the limitation of two tenths of one mill of the taxable property in the state imposed by the 1924 amendment of such section, which relates only to appropriations for forestry purposes, the word "section," as used therein, not being intended to apply to the entire section, but only to the provision including the forestry amendment. p. 193.
5.  Ch. 289, Laws of 1923, which provided for the submission of the 1924 forestry amendment to a vote of the people in the manner provided by law, but did not expressly prescribe the form of question to be submitted, is a sufficient compliance

with sec. 1, art. XII, Const., prescribing the manner of sub-mission, in view of sub. (1), sec. 6.10, sub. (6), sec. 6.19, and sub. (8), sec. 6.23, Stats., respecting submission, the word "manner" meaning way or mode of procedure.   p. 199.

6. *It would appear,* under existing law, to be highly desirable that the form in which a proposed constitutional amendment be submitted to the voters should be prescribed and set forth in · the legislative act directing the submission, but this is not essential, the form being, after all, a mere form; and it is sufficient if there be an intelligent and comprehensive sub-mission to the people of a question which will fully inform them on the subject on which they are voting.   p. 200.

7. The provisions of the state constitution as to amendments thereto are mandatory and not merely directory.   p. 203.

8. The provision in the forestry amendment relating to the amount of expenditures does not limit the expenditures for both for-estry and highway purposes to two tenths of one mill of the taxable property of the state, but the limitation applies solely to money to be raised and appropriated for forestry purposes. p. 206.

ORIGINAL ACTION of *mandamus* in this court to compel the defendant *Zimmerman,* as secretary of state, to audit a voucher for the payment of $25 to *N. B. Dexter* for right of way acquired on a federal-aid project undertaken by vir-tue of an appropriation of $1,000,000 made by sec. 2, ch. 30, of the Laws of 1925.

The petition (omitting the formal parts), among other things, alleges the presentation by the state highway com-mission to the defendant *Zimmerman* of the voucher above referred to, in payment for a right of way acquired for the construction of Wisconsin federal-aid project number 406 A, which project was undertaken pursuant to the appropriation of $1,000,000 made by sec. 2 of ch. 30 of the Laws of 1925; that the said item of $25 is a charge against the appropria-tion made by said sec. 2 of ch. 30, and in order to pay the same it will be necessary for the secretary of state to set up the million dollar appropriation so provided; that the de-fendant *Zimmerman,* as such secretary of state, refused to audit said voucher, upon the ground that the said appropria-tion of $1,000,000 as above referred to is unconstitutional

and void, for the reason that it exceeds the limitation of two tenths of a mill provided for in sec. 10 of art. VIII of the constitution of Wisconsin; that said secretary of state in his official capacity has also declared his intention to refuse payment of any vouchers presented, to be paid out of said appropriation, or which may be presented for payment out of any appropriation made by the Laws of 1925 for highway construction or maintenance; that there is now in force in this state sec. 85.04, Stats., which requires the registration of automobiles and other motor vehicles, and which imposes a license fee for such registration; that pursuant to ch. 11 of the Laws of 1925 a tax upon gasoline was imposed, amounting to two cents per gallon; that the estimated license fee for automobiles and other motor vehicles amounts to $8,120,000; and the amount which the gasoline tax will realize is about $4,888,000; and that approximately $2,000,000 will be received from the federal government by way of federal aid for the construction of highways; that by ch. 11 and sec. 2 of ch. 30 of the Laws of 1925, the revenues above referred to, amounting to about $15,000,000, have been appropriated for highway purposes.

The petition also alleged that the payment of said voucher is necessary in order to continue the highway work, and that the state will suffer irreparable injury if said highway work is discontinued, and that it will also jeopardize payment by the federal government of the sum of about $2,000,000 allowed by it to the state for federal aid.

The petitioner prays for an alternative writ of *mandamus,* and also a peremptory writ commanding the secretary of state to audit and allow said voucher and to issue his warrant upon the treasurer for the payment thereof. This court, pursuant to such petition, issued its alternative writ of *mandamus,* and upon the service thereof the secretary of state moved to quash such writ on the allegations contained in the petition.

State ex rel. Ekern v. Zimmerman, 187 Wis. 180.

For the plaintiffs there were briefs by the *Attorney General, C. A. Erikson,* deputy attorney general, *Franklin E. Bump,* assistant attorney general, and *F. C. Seibold,* law examiner, and oral argument by *Mr. Erikson* and *Mr. Bump.*

*Walter H. Bender* of Milwaukee, for the defendant.

The following decision was announced June 2, 1925:

*By the Court.*—The motion to quash the alternative writ of *mandamus* is denied, and a peremptory writ is ordered issued as prayed for. An opinion will be filed later.

The following opinion was filed June 22, 1925:

DOERFLER, J. The issues presented herein are of great importance. As stated in the petition, a scheme of internal improvements of the state is involved. Defendant's counsel takes the position that the constitutional amendment of 1924 limits the expenditures for both highway and forestry purposes to two tenths of a mill of the taxable property of the state as determined by the last preceding state assessment, while plaintiff's counsel contend that such limitation applies solely to expenditures for forestry purposes. The legislatures of 1921 and 1923 passed upon this amendment in the following form:

"Resolved by the Senate, the Assembly concurring, that section 10 of article VIII of the constitution be amended to read:

"Article VIII. Section 10. The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; but whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid

State ex rel. Ekern v. Zimmerman, 187 Wis. 180.

of their completion. Provided that the state may appropriate money in the treasury or to be thereafter raised by taxation for the construction or improvement of public highways. Provided, that the state may appropriate moneys for the purpose of acquiring, preserving and developing the forests of this state; but there shall not be appropriated under the authority of this section in any one year an amount to exceed two tenths of one mill of the taxable property of the state as determined by the last preceding state assessment."

In this form it was submitted to the vote of the people at the election in November, 1924.

The purpose of construction of a constitutional amendment is to give effect to the intent of the framers and of the people who have adopted it; "and it is a rule of construction applicable to all constitutions that they are to be construed so as to promote the objects for which they were framed and adopted." 8 Cyc. 730. "But the intent is to be ascertained, not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole, in view of the evil which existed calling forth the framing and adopting of such instrument, and the remedy sought to be applied; and when the intent of the whole is ascertained, no part is to be construed so that the general purpose shall be thwarted, but the whole is to be made to conform to reason and good discretion." 8 Cyc. 731, and cases cited under note 46. With these general provisions of construction in mind, we will proceed to ascertain the intent of the legislature and of the people in passing upon this constitutional amendment.

At the time of the adoption of the constitution the question of internal improvements was one which was thoroughly considered and debated by the framers. States admitted prior to Wisconsin, under constitutional provisions permitting of internal improvements, had met in some instances with disastrous experiences. The entire country was comparatively new and undeveloped, and the accumulated wealth of the people was but a small fraction of that which exists

at the present time. This was particularly so with Wisconsin when the constitution was adopted. Those who came to the state at that early date and constituted its inhabitants were largely actuated by a desire of engaging in agriculture and the development of the soil. The entire state was covered with a growth of growing timber of great variety, and the products of the forests were so vast and available that they commanded a very low price. The highways theretofore laid out and established under the territorial government were few and far between and of the crudest nature. The principal means of transportation throughout the entire country was by means of navigation, and the railroads were in their infancy. The difficulty and the cost of internal improvements, when viewed in the light of the ability of the inhabitants to meet expenditures on account thereof, presented an obstacle which was apparently insurmountable. Therefore, after considerable debate in the convention, a constitutional provision was presented and adopted which was designed to meet the situation as it then existed, and it assumed a form which in substance prohibited the incurring of indebtedness for such purpose, excepting only that it allowed the use of the proceeds of grants of property dedicated for that purpose to be used in the limited way prescribed. The development of highways, therefore, for many years followed a very slow and uncertain course, but the proportions assumed at all times seemed to meet the necessities of the situation as they developed in the course of the growth of the population.

The history of the prohibition against internal improvements is thoroughly set forth in the opinions in *State ex rel. Owen v. Donald,* 160 Wis. 21, 151 N. W. 331, and *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115, and reference thereto is hereby made.

During the period between 1850 and 1880 the railroad systems of the state were developed to such an extent as to afford ready and available means of transportation, not only

between the various parts of the state but between the state and other parts of the Union, and such railroad transportation assumed such proportions in the course of time that it supplanted to a large extent the former means of transportation by water.

At the close of the last century the automobile was invented, and used to a limited extent upon the highways in the state. While the feasibility and practicability of this new invention was obliged to meet the test of all new innovations, it developed with marvelous rapidity. The types as first constructed were crude and cumbersome, and but few of our people then had a vision of the great development that followed in the course of less than a quarter of a century. However, it soon became apparent that the automobile had come to stay, at least until such time when the mind of man would contrive something newer and better. The successful operation of the automobile required a better highway system, and it is a matter of common knowledge, of which the courts can take judicial notice, that when the year 1905 arrived it was quite generally realized that in order to make available and to utilize this new means of transportation to its fullest extent the constitutional prohibition which stood in its way, in the form of sec. 10 of art. VIII of the constitution, required an amendment, and that the amendment then proposed by the legislature had its origin in this new invention and the desire of the people to exploit it to the highest degree.

Wisconsin at that time no longer presented the primeval appearance which existed when the constitution was adopted. In the eastern, southern, and western parts of the state the land had been largely cleared of its forests and converted into prosperous and productive farms. The rural population had assumed vast proportions, and everywhere in the portions of the state mentioned the farming lands were studded with modern farm houses and the appurtenances of a farm. The agricultural wealth of the state had kept pace

with the progress of the state in general, and with the development of agriculture came the numerous cities and villages, teeming with a population engaged in commerce, manufacture, and in the various forms of labor connected therewith. The principal obstacle, namely poverty, which confronted the early settlers, and which operated in the establishment of the prohibition against internal improvements, had been obviated. Therefore, in 1905, a highway amendment to the constitution was proposed, was passed by the legislature and submitted to it in its following session of 1907, and again passed, and became a part of the constitution upon its ratification at the November election of 1908. The amendment thus enacted to sec. 10 of art. VIII read as follows: "Provided that the state may appropriate money in the treasury or to be thereafter raised by taxation for the construction or improvement of public highways."

It will be observed that the prohibition as originally contained in the constitution was otherwise left in full force and effect, and that the amendment was designed to and actually did reach out to cover only one form of internal improvement, which consisted in the establishment and maintenance of a system of public highways. Nor was there any limitation contained in the amendment restricting the appropriations and the amount to be raised by taxation to any particular amount, this having been left entirely to the wisdom and good judgment of the legislature.

As has already been said, the state at the time of the adoption of the constitution was covered with a primeval growth of growing timber, of such vast and enormous proportions that the thought of the ultimate exhaustion of this great natural resource was not contemplated. In fact, for many years timber was deemed a drug on the market and the demand for it was limited, and the proceeds of the product barely met the actual cost of production. The writer can recall many instances where large masses of the finest hard-wood logs were assembled in a huge pile, ignited and

consumed by combustion, and that in close proximity to the metropolis of the state. As the population increased, however, as time went on, and as new inventions in all the various human activities were brought forth, the wealth of the people correspondingly increased, and the products of the forests were sought and utilized in manufacture and in commerce. The time soon arrived where sawmills and lumber industries were established in nearly every locality. The production of lumber and its manufacture and utilization increased to a marvelous extent and was pursued with a feverish activity, and all of this was stimulated by a high protective tariff upon lumber. So when the year 1907 arrived, the forests in the eastern, southwestern, and southern portions of the state had become largely denuded, and tremendous inroads had been made in what were thought to be the inexhaustible forests of the north. The buzz and hum of the sawmills, at one time everywhere existing in the southern part of the state, had ceased to be heard, and gradually, as the denuding process extended farther to the north, mill after mill was abandoned, until at the present time this great natural resource has been practically wiped out of existence. Large cities that had derived their growth from the manufacture of forest products were gradually converted into general manufacturing and commercial centers. But long before the legislature first considered the advisability of pursuing a policy of forest conservation, many of the states of the Union that had met with a similar experience to that of Wisconsin agitated such a policy, and the civilized countries of Europe had furnished ample experience of the necessity of such a policy. Therefore, the first forestry amendment to sec. 10 of art. VIII was proposed in the legislature of 1907 and there passed; was submitted to the legislature of 1909, where it met a similar fate, and was ratified in the November election of 1910. This amendment read as follows:

"Provided that the state may appropriate moneys for the purpose of acquiring, preserving, and developing the water

power and the forests of the state; but there shall not be appropriated under the authority of this section in any one year an amount to exceed two tenths of one mill of the taxable property of the state as determined by the last preceding state assessment."

It will be noted that this amendment is couched precisely in the language of the amendment ratified by the people in 1924, with the exception that it contains a provision for water power. This amendment was to all intents and purposes in force until the year 1915, when in the decision in the case of *State ex rel. Owen v. Donald,* 160 Wis. 21, 151 N. W. 331, it was held that it was invalid for the reason that the constitutional requirements for an amendment had not been complied with by the legislature.

Under ch. 641 of the Laws of 1907 and ch. 458 of the Laws of 1909, the legislature appropriated the small sum of $10,000 a year under the highway amendment. From that time on, the appropriations for this purpose rose in large proportions. Pursuant to ch. 337 of the Laws of 1911 the annual appropriation amounted to $390,000. For the year ending June 30, 1914, the appropriation was $1,811,056. For the year ending June 30, 1915, it was $1,393,563. For the year ending June 30, 1916, $987,273. For the year ending June 30, 1917, $1,470,885. For the year ending June 30, 1918, $1,159,127. For the year ending June 30, 1919, $3,397,397. For the year ending June 30, 1920, $5,811,436. For the year ending June 30, 1921, $8,742,734. For the year ending June 30, 1922, $10,187,754. For the year ending June 30, 1923, $7,235,073. For the year ending June 30, 1924, $6,723,479. For the year ending June 30, 1925, $7,320,981.

The appropriation and expenditure of these vast sums of money by the legislature since 1907 are responsible for the creation and maintenance of one of the finest systems of highways in this state of any state in the Union, and during this period the use of the automobile has increased to such an extent that the records in the office of the secretary of

state indicate that about one out of every three of the pop-
ulation of this state is the owner of and operates such an
instrumentality.  Not only that, but it is a fact well known
that this new invention has resulted largely in revolutioniz-
ing the transportation system of the state, and particularly
has supplanted to a high degree the railroad transportation
of passengers and freight.  And this is true not only in
Wisconsin but throughout the entire country.

Long before 1917, when this state accepted the provision
for federal aid, it became apparent to the people of this coun-
try that the new use of the highways would not be confined
to local or state-wide traffic, but to interstate traffic, and
this was one of the principal reasons the federal government
had in mind in extending its aid to the building of new high-
ways; and thereafter there became known what were called
the federal-aid projects, to the carrying out of which the
federal government contributed large sums of money, which
in the latter years approximated about $2,000,000 annually.
In addition to all this, the state trunk highway system was
adopted in the year 1919, which greatly increased the neces-
sity for appropriations and expenditures for highway pur-
poses.  Since the year 1913 the annual appropriations for
highway purposes alone far exceeded the amount of two
tenths of one mill of the taxable property of the state as
determined by the last preceding state assessment, and so
high were the appropriations for highway purposes in some
years as to equal an amount equivalent to eleven times the
sum represented by two tenths of one mill of the taxable
property of the state as fixed by the forestry amendment.
Such was the situation when in 1921 the joint resolution
providing for the forestry amendment was introduced in
the senate, and when it was finally ratified by the people in
1924.  We have also attempted to depict the situation in this
state as it existed during the period of time while it was
deemed that the first forestry and water-power amendment
was in force.

Early in the judicial history of this state, in the case of *State ex rel. Bond v. French,* 2 Pin. 181, it was held that in construing the constitution we are governed by the same rules of interpretation which prevail in relation to statutes. The rules of interpretation of statutes have been frequently passed upon in numerous decisions in this state, and such rules are in harmony with the holdings in other states, and numerous citations and quotations upon that subject would therefore be unnecessary.

In *State ex rel. Time Ins. Co. v. Superior Court,* 176 Wis. 269, 186 N. W. 748, it is said:

"In order to give sec. 2619 as amended by the legislature of 1919 a proper construction, it is necessary to ascertain, if possible, the intent which the legislature had in mind in making such amendment. . . . The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the legislature. 36 Cyc. 1106; *State ex rel. M., St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846. The general rule is that the spirit or reason of the law will prevail over the letter. *State ex rel. M., St. P. & S. S. M. R. Co. v. Railroad Comm., supra; Wis. Ind. School v. Clark Co.* 103 Wis. 651, 79 N. W. 422; *Gilkey v. Cook,* 60 Wis. 133, 18 N. W. 639. It has also been held that, in order to ascertain the object the legislature had in mind, it is proper to consider the occasion and necessity of the enactment, the defects or evils in the former law, and the remedy provided by the new one, and the statute should be given that construction which is best calculated to advance its object, by suppressing the mischief and securing the benefits intended. 36 Cyc. 1110."

But counsel for the defendant calls our attention specifically to the decision in the case of *B. F. Sturtevant Co. v. Industrial Comm.* 186 Wis. 10, 19, 202 N. W. 324, where it is said:

"Words or terms used in a constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in in-

terpreting statutes and acts of the legislature. This gives rise to the recognized rule of construction that it is presumed that words appearing in a constitution have been used according to their plain, natural, and usual significance and import, and the courts are not at liberty to disregard the plain meaning of words of a constitution in order to search for some other conjectured intent." Also citing 6 Ruling Case Law, p. 52, § 47, entitled "Constitutional Law."

The only difference between an act ratified by the people and one passed by the legislature, when it comes to the matter of interpretation or construction, consists in the difference which exists in the make-up of the body passing or ratifying an act. In each instance the element of intent is a predominating factor, and this court has not otherwise held. In each instance where a doubt is raised either from the language employed or from the history of the enactment, or from the object and purpose it is designed to achieve, these elements may be taken into consideration in order to establish the intention.

The people of the state at the present time, more so than ever before, are presumed to be familiar with the elements of the constitution and with the laws. Under the statute in this state, education is compulsory up to the eighteenth year. In the schools of the state the study of the constitution is a part of the curriculum, and all matters of public interest are the subject of discussion. The newspapers have a large and general circulation, and in their columns there may be found daily discussions of matters pertaining to the public interest. Even the pulpit has taken up such discussions, and matters of great importance and of public interest receive attention. Private and public organizations exist everywhere, in which the obligations of good citizenship are taught and in which vital questions of public interest are discussed, and political organizations are also principally devoted to the education of the masses upon pending questions of public welfare. In fact, it may be truthfully said that no citizen is in reality

competent to cast an intelligent vote unless he first informs himself of the subject to be voted upon.

With these considerations in mind, how can it be successfully maintained that the people of the state, when they ratified the forestry amendment, were misled or misinformed as to the actual or real purpose thereof? And when we further consider the actual question submitted, which read as follows: "Shall amendment to article VIII, section 10, of the constitution, providing that the state may appropriate not to exceed two tenths of one mill of the taxable property for forestry purposes, be adopted?" and the publication of the notice provided for by sec. 6.10 of the Statutes, which read as follows: "Under the present provisions of the constitution, the state is prohibited from engaging in internal improvements except under grant of property to the state especially dedicated to particular works of internal improvement, and except as to the construction and improvement of public highways. If the proposed amendment is ratified, the state may appropriate money (not exceeding in any one year two tenths of one mill of the state's assessment of taxable property) for the purpose of acquiring, preserving and developing the forests of the state,"—can it be said that the voters were not adequately enlightened as to the true nature and import of this amendment? To ask the question is to answer it. No one, prior to the election in November, 1923, when members of the legislature were elected largely with the view of representing their constituents upon this important amendment, nor during the campaign preceding the ratification in 1924, took the position that the effect of this amendment would be to limit the amount to be appropriated or raised for both highway and forestry purposes to two tenths of one mill of the taxable property of the state as determined by the last preceding state assessment. The people voted intelligently upon this proposition, which clearly evidences their intention, and, where such intention appears,

the construction and interpretation of the acts must follow accordingly.

The word "section," which is used in the amendment, should be interpreted and construed so as to conform to the views that both the legislature and the people had when they adopted the provision. The Century Dictionary and Encyclopedia defines the word "section" as "a division, a portion, or a paragraph." When the word "section," therefore, was used, the legislature clearly intended not the entire section, but that portion of the provision which included the forestry amendment. The word "section" has also been interpreted as meaning a subdivision or subsection. See *Spring v. Collector of Olney,* 78 Ill. 101; *Graves v. Scales,* 172 N. C. 915, 90 S. E. 431; *Ex parte Pea River P. Co.* 207 Ala. 6, 91 South. 920.

But defendant's counsel further advances the view that inasmuch as in 1925 provisions had been made for the raising of a vast sum of money which resulted from registration fees, the tax on gasoline, and the federal aid, which approximated $15,000,000, that this clearly signifies that such amount would be substantially adequate for the establishment and maintenance of highways, and that the additional amount, which consisted of the two tenths of one mill of the taxable property of the state, would meet the needs of both highway and forestry purposes; that the governor, in view of the alarming increase of appropriations for highway purposes, had, prior to the legislative session of 1925, strenuously advocated the policy of retrenchment, and that such executive proclamation reflected largely the sentiments of the people of the state upon the subject, and that these considerations must be recognized as facts and as part of the surrounding circumstances in the construction to be placed upon the amendment of 1924. The appropriations, however, made between 1921, when the present forestry amendment was introduced in the legislature, and 1925, do not support or justify such view. That the moneys raised for highway purposes

State ex rel. Ekern v. Zimmerman, 187 Wis. 180.

must naturally have a tendency to increase as time goes on and as the state proceeds in its course of progress and development, needs no argument for support. The highways already established require for their preservation constant attention and supervision, and the cost of maintenance increases with the age of the highway. Construction cost of new highways has kept pace with the ever-increasing cost of labor and material, all of which has depreciated materially the purchasing price of the dollar; and, in fact, such increase has risen to such a point as in many instances to double and to treble the cost as it formerly existed. That some retrenchment policy becomes advisable at times cannot be doubted; but that the new highways constructed and maintained, even at the present high cost, constitute a great economic factor which is more than compensating for the expense (leaving out of consideration the matter of the public welfare and the health of the community.), is beyond controversy.

In leaving this branch of the subject which involves the construction of the forestry amendment, we will quote the forceful and significant language of Mr. Justice BREWER, then a member of the supreme court of Kansas, in the opinion of the court in *Prohibitory Amendment Cases,* 24 Kan. 700, 720, quoted in *People v. Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. Rep. 34:

"We may not ignore public history. Nearly two years elapsed between the time the proposition passed the legislature and the day of the popular vote. During this time this question was not forgotten. It was discussed in every household and at every meeting. The state was thoroughly canvassed; its merits and demerits were presented and supported by all possible arguments. Pulpit, press, and platform were full of it. It was assumed on all sides that the question was before the people for decision. There was not even a suggestion of any such defect in the form of submission as would defeat the popular decision. If this objection had been raised prior to the election, the legislature could have been easily convened, and the defect remedied. But there was not

State ex rel. Ekern v. Zimmerman, 187 Wis. 180.

a suggestion from friend or foe. The contest was warm and active. After the contest was ended and the election over, the claim is for the first time made that after all there was nothing in fact before the people; that this whole canvass, excitement, and struggle was simply a stupendous farce, meaning nothing, accomplishing nothing. This is a government of the people, by the people, and for the people. This court has again and again recognized the doctrine lying at the foundation of popular governments, that in elections the will of the majority controls, and that mere irregularities or informalities in the conduct of an election are impotent to thwart the expressed will of such majority."

While we do not agree with the decision of the court in that case, and while parts of the decision are grossly out of harmony with the great weight of authority, we believe the foregoing expression in the opinion is apt, and largely applicable to the consideration of the matter now before us.

The wording of the forestry amendment may be deemed unfortunate, and it may also be said that in a matter of such vast importance language should have been employed which would have barred all criticism. But legislators are human and are subject to err. Perfection is an attribute solely of the Supreme Ruler of the universe; and because of the tendency for human beings to err, the necessity for construction has arisen and exists, and such construction is designed chiefly to ascertain the intention, in order that the voice of the people may receive proper recognition and that it may not be thwarted.

Counsel for the defendant also argues that the forestry amendment was not submitted for ratification to the vote of the people in the November election of 1924 in accordance with the provisions of sec. 1, art. XII, of the constitution, entitled "Amendments." This provision reads as follows:

"Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amend-

ments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election; and if, in the legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become part of the constitution. . . ."

Counsel raises the specific objection that ch. 289 of the Laws of 1923 did not comply with sec. 1 of art. XII of the constitution, in that it did not expressly prescribe the form of the question in which the forestry amendment should be submitted, and that the language of the constitution where it is said that the legislature shall submit such proposed amendment or amendments to the people *"in such manner . . . as the legislature shall prescribe"* must be construed to mean that the legislature, in the act directing the submission, shall prescribe a form in which the amendment shall be submitted. Ch. 289, Laws of 1923, among other things provides as follows:

"The foregoing proposed amendment to the constitution of this state shall be submitted to the people at an election to be held in the several election districts in this state on the Tuesday next succeeding the first Monday in November, 1924, *in the manner provided by law for the submission of amendments to the constitution at a general election,* and if the people shall approve and ratify said amendment by a majority of the electors voting thereon such amendment so ratified shall become a part of the constitution of this state."

· Prior to the year 1893 it was the common practice of the legislature, in passing a law directing the submission of an amendment to the constitution to the vote of the people, to specifically set forth the form in which the amendment was

to be submitted. In the year last named ch. 288 of the laws was passed, and secs. 29, 50, 83, 100–102 were included in such chapter. These last named sections were substantially incorporated in the statutes of 1923, and numbered respectively sec. 6.10, sub. (1) ; sec. 6.19, sub. (6) ; and sec. 6.23, sub. (8). Sub. (1) of sec. 6.10 now provides as follows:

"(1) The secretary of state, not later than the fifteenth day of September in each year in which state officers, United States senators, representatives in congress, members of the assembly and state senators are to be elected for a full term of office, or in which electors of president and vice-president are to be elected, shall make out a notice in writing stating that at the general election to be held on the Tuesday next succeeding the first Monday in November following the officers aforesaid, or so many of such officers as are then to be chosen, are to be elected, and specifying in the case of such representatives and senators the respective districts in which they are to be elected; and whenever officers are to be chosen to fill vacancies, the names of the last incumbents of said offices and the date of expiration of terms for which they were elected shall be given; and also any constitutional amendment or other question to be submitted to the electors of the state for a popular vote. The secretary of state shall append to each such constitutional amendment or other question to be submitted to the people a brief statement of the change that will be made in the constitution or the existing laws if such amendment or other question so submitted shall be ratified or approved by the people at such election. Such statement shall contain no argument for or against any such amendment or other question so submitted. The said secretary shall publish a copy of such notice in the official state paper once in each week from not later than the last Friday of September until the election to which it refers."

Sec. 6.19, sub. (6), provides:

"Whenever a constitutional amendment or other question is required to be submitted to a vote of the people, the secretary of state shall, not less than twenty-five days prior to the election at which such amendment or question is required to be submitted, transmit by mail a certified copy thereof to each county clerk in the state."

Sec. 6.23, sub. (8), provides:

"Whenever a proposed amendment to the constitution, or any measure or other question shall be submitted to a vote of the people, a concise statement of the nature thereof shall be printed *in accordance with the act* or resolution *directing its submission* upon a separate ballot provided for that purpose, and underneath the question as thus stated shall appear the words 'yes' and 'no,' and after and to the right of each of said words there shall be a square. At the top of said ballot shall be printed in letters of not less than three eighths of an inch in length the words 'Official Referendum Ballot.' Underneath said words, and in plain, legible type shall appear the following instructions to voters: 'If you desire to vote for any question, make a cross (X) or other mark in the square after the word 'yes,' underneath such question; if you desire to vote against any question make a cross (X) or other mark in the square after the word 'no,' underneath such question.' This form of ballot shall be used at all elections at which questions are submitted to the people."

It will be noted that under sub. (8) of sec. 6.23 of the Statutes the legislature prescribes that the question to be voted upon shall be printed in accordance with the act or resolution directing its submission, etc. Ch. 289 of the Laws of 1923 does not prescribe the form of the submission, but provides that it shall be submitted *in the manner* provided by law, etc. The manner of the submission is set forth in detail in said sub. (8). This raises another question of construction, and involves the meaning of that portion of sec. 1 of art. XII, Const., in which the term "manner" is used. In *Little v. State,* 133 Ind. 577, 580, 33 N. E. 417, it is said: "Manner signifies mode of action, way of performing or effecting anything, method, style." In *Bankers L. Ins. Co. v. Robbins,* 59 Neb. 170, 174, 80 N. W. 484, it is said: "The manner of doing a thing has reference to the way of doing—to the method of procedure. . . ." In *People v. English,* 139 Ill. 622, 29 N. E. 678, 15 L. R. A. 131, the word "manner" as used in sec. 5, art. VIII, of the Illinois constitution indicates merely that the legislature may

provide by law the usual, ordinary, or necessary details required for the holding of the election. Webster's Collegiate Dictionary (3d ed.) defines the term "manner" as follows: "A way of acting; a mode of procedure or execution; way; mode." The foregoing definitions of the term "manner" are in accordance with the popular understanding of such term. This meaning, however, may be broadened by the language of the act and its context, and particularly when such language is used in connection with other parts of the act. Where a thing is required to be done in the manner prescribed by a certain section of an act, and if such section referred to includes the element of time and the element of form, then the term as used must be construed to mean both time and form. In legal parlance, in describing a certain procedure, the expression is often used, "in manner and form, etc.," thus distinguishing and differentiating the two terms. It is true that prior to 1893 legislatures proposing amendments to the constitution have prescribed the form of the submission. After 1893 constitutional amendments were enacted where the legislature continued the former practice, but it was considered that such practice was pursued in the exercise of unusual precaution, in view of the importance of the proposed enactments.

A constitutional amendment being designed to affect the fundamental law, the highest degree of care and foresight which the legislature is capable of exercising, in order that the proposed amendment may not fall by the wayside and thus result in thwarting the will of the people, should be exercised as an act of wisdom, and therefore, under the law as it now exists, it would appear to be highly desirable that the form of the question which should be submitted should be prescribed and set forth in the act directing its submission. Every legislature has among its members lawyers who have obtained distinction in their profession and who have made a special study of constitutional law, and ever since

the adoption of the constitution it has been the practice of the legislature to appoint such members on the judiciary committees of the two houses. The knowledge, experience, and prudence of such members of the judiciary committee, when supplemented by the aid and advice of the legal department of the state, are liable to result in the production of a better form of submission than if the whole responsibility is rested upon an administrative officer, with the aid of the attorney general alone. But the question raised in the instant case is not one which involves the best method, the greatest wisdom, or the most comprehensive foresight, but whether the general statutes above referred to were adequate to comply with the constitutional provisions; and this depends entirely upon the construction to be placed upon the provision of the fundamental law above quoted on the subject of amendments. Had the framers of the constitution intended that the legislature should prescribe the form, it might easily have done so by using a few additional words, or it might have so worded the provision that the idea of form would have been necessarily included by implication. This, however, was not the case, and it is highly probable that the framers had in mind the vital distinction existing between matters of substance and matters of mere form. Had the legislature in the instant case prescribed the form of submission in a manner which would have failed to present the real question, or had they by error or mistake presented an entirely different question, no claim could be made that the proposed amendment would have been validly enacted. In other words, even if the form is prescribed by the legislature it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment. This demonstrates quite clearly the fact that the form of submission is after all a mere form, and that the principal and essential criterion consists in the submission of a question or a form which has for its object and purpose an intelligent

State ex rel. Ekern v. Zimmerman, 187 Wis. 180.

and comprehensive submission to the people, so that the latter may be fully informed on the subject upon which they are required to exercise a franchise.

Nor are we prepared to say that every provision of the constitutional amendments is not mandatory; on the contrary, we agree with the views expressed by Judge Cooley in his great work on Constitutional Limitations:

"But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules, by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication. There

are some cases, however, where the doctrine of directory statutes has been applied to constitutional provisions; but they are so plainly at variance with the weight of authority upon the precise points considered·that we feel warranted in saying that the judicial decisions as they now stand do not sanction the application." Pages 94 and 95 (4th ed.).

In the case of *Sjoberg v. Security S. & L. Asso.* 73 Minn. 203, 75 N. W. 1116, it was held that art. IV, sec. 13, of the constitution of Minnesota, which provides that the style of all laws of that state shall be, "Be it enacted by the legislature of the state of Minnesota," is mandatory. A similar holding will be found in *State v. Rogers,* 10 Nev. 250; *May v. Rice,* 91 Ind. 546; *Burritt v. Commissioners,* 120 Ill. 322, 11 N. E. 180; *State v. Patterson,* 98 N. C. 660, 4 S. E. 350. In *McPherson v. Leonard,* 29 Md. 377, it was held that such a provision was directory merely, and it was likewise so held in *Cape Girardeau v. Riley,* 52 Mo. 424. In *Pim v. Nicholson,* 6 Ohio St. 176, a provision of the constitution of Ohio that "No bill shall contain more than one subject, which shall be clearly expressed in its title," was held directory.

In the *Sjoberg Case* it is further held:

"Unless a constitutional provision shows upon its face that it was intended to be directory, it must be accepted as the imperative mandate of the sovereign people, and not as good advice which legislators and courts may accept or reject as they please. The safety of the state and the protection of the liberties and rights of the people demand that this rule be strictly adhered to."

An examination of the decisions upon the subject now considered will disclose that the great weight of authority in this country is in accordance with the doctrines laid down, and quoted above, by Cooley in his work on Constitutional Limitations.

Ch. 289 of the Laws of 1923 provides that "The amendment shall be submitted in the manner provided by law for the submission of amendments to the constitution. . . ."

The provisions of law with respect to the submission are contained in secs. 6.23, 6.19, and 6.10. Under sub. (8) of sec. 6.23 a concise statement of the nature of the amendment was printed upon a separate ballot provided for that purpose, and underneath the question as thus stated there appeared the words "Yes" and "No," and after and to the right of each of said words there was a square. At the top of the ballot was printed, in letters not less than three eighths of an inch in length, the words "Official Referendum Ballot," and underneath said words, and in plain, legible type, there appeared the following instructions to voters: "If you desire to vote for any question, make a cross (X) or other mark in the square after the word 'Yes,' underneath such question; if you desire to vote against any question, make a cross (X) or other mark in the square after the word 'No,' underneath such question."

It will thus appear that the method of procedure and the mode of submission have been fully outlined by the statute, and that they fully correspond and comply with the requirements of the constitution, and that the methods so prescribed were in compliance with the act of submission of the amendment. True, the legislature did not formulate the question, but under sec. 6.23 the duty of preparing and submitting the ballots devolves upon the secretary of state. The drafting of the form of the question is a simple ministerial duty, which any high school student of average ability would be able to perform. But the secretary of state did not proceed to draft this question upon his own initiative, but in doing so he followed the dictates of the statutes. The question submitted on the ballot has heretofore been quoted. It is clear and unambiguous, so as to enable voters to vote intelligently.

It is true that the amendment was not set forth upon the ballot, but the proposed amendment, in accordance with the provisions of sub. (1), sec. 6.10, was contained in the resolution and was published in the official state paper once in each

week from not later than the last Friday of September until the election to which it referred, and appended to such constitutional amendment and published therewith was the notice provided for by sub. (1), sec. 6.10, containing a brief statement of the change that will be made in the constitution if such amendment so submitted shall be ratified and approved by the people at such election. This notice also was couched in the clearest and most precise language, and, pursuant to the directions of the legislature, was prepared by the secretary of state. When the legislature has passed the amendment, and when it has complied on its part with the other requirements of the constitution, the proceedings thereafter are preliminary to the submission of the amendment to the vote of the people, and the publication of the notice required by sub. (1), sec. 6.10, of the Statutes is designed to bring home to the knowledge of the voters the submission of the proposed amendment at the election, together with the amendment itself, and the change which the amendment will work upon the existing constitution. The publication of this notice is therefore in reality a part of the submission.

Under these circumstances it can hardly be claimed that the constitutional provision on amendments has not been fully complied with, and that the legislature has not prescribed the manner of submitting the amendment to the vote of the people. No authority on the precise question here presented was cited by either counsel, and we have found none. While the question is not entirely free from doubt, we are constrained to hold that the legislature did prescribe the manner of the submission of the amendment, and that the constitutional requirements on amendments have been fully complied with.

Defendant further contends that the original evidence of the joint resolution in the highway amendment has not been preserved. It does appear, however, that the substitute resolution as it was passed by the 1905 and 1907 legislatures is on file, and such substitute resolution takes the place of the

original joint resolution. The history of the highway amendment clearly indicates that from the time of the introduction of the original joint resolution down to the final passage of the amendment by the legislature of 1907, all of the constitutional provisions have been fully complied with, and that all steps and proceedings have been fully taken in a manner as approved in *State ex rel. Postel v. Marcus*, 160 Wis. 354, 152 N. W. 419. This is likewise true of the forestry amendment.

From the foregoing it follows that both the highway amendment and the forestry amendment have been duly enacted, and that the provision containing the forestry amendment does not limit the expenditures for both highway and forestry purposes to two tenths of one mill of the taxable property of the state as determined by the last preceding state assessment, but that such limitation applies solely to moneys to be raised and appropriated for forestry purposes; and that a peremptory writ of *mandamus* must issue out of this court to the secretary of state to audit and allow the voucher referred to in the petition; and that he issue his warrant upon the state treasurer for the payment thereof.

*By the Court.*—It is so ordered.