STATE EX REL. THOMSON, Attorney General, and others, Petitioners, vs. PEOPLES STATE BANK, Respondent.

*March 9—April 3, 1956.*

For the petitioners there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, for the state of Wisconsin, and *John N. Kramer* of Fennimore, for Joint School District No. 2, attorneys, and *Lines, Spooner & Quarles* of Milwaukee of counsel, and oral argument by *Mr. Persons* and *Mr. Kramer,* and by *Mr. Lawrence C. Hammond* of Milwaukee.

For the respondent there was a brief by *Spohn, Ross, Stevens, Lamb & Pick* of Madison, and oral argument by *Francis Lamb.*

A brief was filed by *Robert D. Sundby* of Madison, counsel for the League of Wisconsin Municipalities, as *amicus curiae.*

BROADFOOT, J.   At the regular 1953 session of the legislature Joint Resolution No. 47 was duly adopted. Except as we have deleted the last part of the section, which was not amended, the joint resolution read as follows:

"A Joint Resolution

"To amend article XI, section 3, of the constitution, relating to the valuation of property in ascertaining the debt limitation of school districts and certain cities for school purposes.

"*Resolved by the senate, the assembly concurring,* That article XI, section 3, of the constitution be amended to read:

"(Article XI) Section 3. Cities and villages organized pursuant to state law are hereby empowered, to determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as shall with uniformity affect every city or every village. The method of such determination shall be prescribed by the legislature. No county, city, town, village, school district, or other municipal corporation shall be allowed to become indebted in any manner or for any purpose to any amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained, *other than for school districts,* by the last assessment for state and county taxes previous to the incurring of such indebtedness *and for school districts by the value of such property as equalized for state purposes*: Except that for any city which is authorized to issue bonds for school purposes the total indebtedness of such city shall not exceed in the aggregate eight per centum of the value of such property *as equalized for state purposes; the manner and method of determining such equalization for state purposes to be provided by the legislature.* . . . Be it further

*"Resolved,* That the foregoing proposed amendment to the constitution be published for three months previous to the time of holding the next general election, and is hereby referred to the legislature to be chosen at such election." (The italicized parts contain the changes.)

The resolution was published for three months previous to the holding of the general election in November, 1953, as provided therein. At the regular 1955 session of the legislature Joint Resolution No. 12 was duly adopted. The portion thereof containing sec. 3, art. XI, Const., with the proposed amendments is not recopied herein as it is identical with the copy thereof in the 1953 joint resolution. Otherwise the resolution read as follows:

## "A Joint Resolution

"To amend article XI, section 3, of the constitution, relating to the valuation of property in ascertaining the debt

limitation of school districts and certain cities for school purposes.

"WHEREAS, at the regular session of the legislature in the year 1953, an amendment to the constitution was proposed and agreed to by a majority of the members elected to each of the two houses, which proposed amendment reads as follows:

". . . Now, therefore, be it

*"Resolved by the assembly, the senate concurring,* That the foregoing amendment to the constitution is agreed to by this legislature; and be it further

*"Resolved,* That the foregoing proposed amendment be submitted to a vote of the people at the election to be held on the first Tuesday of April, 1955, and if a majority of the voters voting thereon approve this amendment, it shall become a part of the constitution of the state; and be it further

*"Resolved,* That the change contemplated herein shall take effect with the assessment made May 1, 1955; and be it further

*"Resolved,* That the question of ratification of the foregoing amendment be stated on the ballot as follows:

" 'Shall section 3 of article XI of the constitution be amended so that the limitation on the indebtedness of school districts and cities authorized to issue bonds for school purposes shall be based on the value of the taxable property in such school district or city as equalized for state purposes rather than on the local assessed value of such property, such method of determining equalized value for state purposes to be provided by the legislature?' "

Thereafter, under date of March 11, 1955, the secretary of state published and mailed to the several county clerks of the state a notice respecting the April 5, 1955, election, which contained verbatim said Joint Resolution No. 12 plus the following explanation thereof:

"Effect of ratification. Under existing law (Art. XI, sec. 3, Wis. Const.) a school district's or (certain) city's debt limitation is five per cent of the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of the indebtedness.

The proposed change would substitute the value of property 'as equalized for state purposes' according to legislative direction, in lieu of the existing 'last assessment' value by local officials. The use of the state equalized value could result in some instances in a higher valuation, which in turn would enable school districts and certain cities to borrow more money under the five per cent limitation than they can now borrow under existing law."

The entire notice of election was published by the several county and city clerks. The explanation, however, did not appear upon the ballot, the question of ratification appearing thereon as provided by the joint resolution. At said election 320,376 electors voted in favor of the amendment and 228,641 voted against it.

After the enactment of ch. 220, Laws of 1955, by proper resolutions adopted at duly called meetings, the school district determined that it was necessary to build an addition to its school building and to furnish and equip the same. The school board was authorized to take the necessary steps to construct and equip said addition and to borrow on behalf of the district not to exceed $95,000 to finance the authorized improvements. The school board determined that it was necessary to borrow only $80,000 therefor. Upon application to the respondent bank for a loan it made an offer in writing to loan the school district said sum upon terms outlined in the offer. The offer was thereafter accepted by the school board by proper resolution and a certified copy of the resolution was given to the respondent. Duly executed notes of the school district complying with the terms of the offer were tendered to respondent and demand was made that the money be loaned. Instead, the respondent wrote to the school board attempting to withdraw its written offer to make the loan for the reason that the notes tendered, together with the then outstanding indebtedness of the district, would exceed its constitutional debt limit. Respondent had been advised by

counsel that the amendment of sec. 3, art. XI, Const., and ch. 220, Laws of 1955, were each invalid.

If said amendment and session laws are invalid the amount of the loan offered, with the existing debt of the school district, will exceed its constitutional debt limit. If they are valid, the total indebtedness of the school district, including the loan, will be within the permitted debt limit.

The first contention of the respondent is that the explanation appearing in the notice of election was erroneous and misleading and hence the amendment was not validly ratified. It is conceded that there was an error in the explanation in the notice of election in that sec. 3 of art. XI of the constitution permitted cities authorized to issue bonds for school purposes to incur indebtedness aggregating eight per centum of assessed value. The explanation used the figure "five per centum" throughout. It is contended that the explanation as published might induce electors to vote in favor thereof who might otherwise vote against the amendment. Such electors might regard a debt limitation of five per centum for cities authorized to issue bonds for school purposes as being reasonable in amount. The same electors might regard eight per centum as being excessive and might, therefore, have voted against the amendment if they had not been misled by an official explanation which proclaimed that the limitation was five per centum. A sufficient number of electors may have been affected by the misleading and erroneous statements in the explanation so that the outcome of the referendum might have been different if the true figure had been used therein.

In addition to the joint resolution and the explanation thereof the notice of election contained much information. It started with notice of judicial elections, including a supreme court justice, a county judge in each county, circuit judges in four circuits, two judges in branches of the civil

court of Milwaukee county, a judge of the children's court of Milwaukee county, and several municipal judges. Following the explanation which has been challenged there appears a verbatim printing of Joint Resolution No. 14 adopted by the 1955 legislature respecting the creation of sec. 24, art. VII, Const., providing for the retirement and eligibility of justices of the supreme court and circuit judges, together with an explanation thereof. Thus the explanation challenged appeared about three quarters of the way down in a lengthy notice of election. The majority in favor of the adoption of the constitutional amendment was more than 91,000. To have changed the result, more than 45,000 electors who voted for the amendment would have had to have changed and voted in the negative instead of the affirmative. There is no way of knowing how many electors read the explanation, but it is inconceivable that as many as 45,000 electors would read it or that they were misled in their voting.

In *Wisconsin P. & L. Co. v. Public Service Comm.* 232 Wis. 59, 286 N. W. 588, a similar situation arose and the same argument was made. That case involved the submission to the voters of the village of Cambridge of the question of purchasing the electric plant and equipment located in said village and owned by the Wisconsin Power & Light Company. The court there said (p. 65):

"There is no showing that any voter was in fact misled by the publication of the resolution, or that he would have voted differently had the resolution not been published. In order to sustain appellant's contention we would have to assume that the voters of the village of Cambridge were misled by the contents and publication of the resolution, notwithstanding the fact that the question printed upon the referendum ballot was in proper legal form, clear and unambiguous. In the absence of a showing to the contrary, we must assume that the voters understood the question upon which they voted either in the affirmative or negative. So far as this issue is concerned, we must hold the election valid."

The ballot was on the official pink form D prescribed by the statutes and the question upon the ballot was that prescribed by the joint resolution. There is no claim that the question as submitted was improper in any respect. The ballot was what the electors came directly in contact with. They presumably read the question as it appeared thereon and it is natural to assume that the question on the ballot was controlling. Under the circumstances we cannot say that there was any doubt or confusion in the minds of the electors at the time of voting. Certainly a sufficient number could not have been misled to have changed the results.

Sec. 6.10, Stats., provides that when an amendment to the constitution is to be voted on at a general election in November the secretary of state shall include an explanation of the effect of the proposed constitutional amendment in the notice of election. There is no similar statute providing for such an explanation when an amendment is to be voted on at a state election held in April. In *State ex rel. Thomson v. Zimmerman,* 264 Wis. 644, 60 N. W. (2d) 416, 61 N. W. (2d) 300, it was held that the provision of sec. 6.10 does not apply when an amendment is submitted at an April election. In the decision in that case we said (p. 658) :

"There is no contention that the publication was made once a week until election nor at any other time except on February 21st, but we cannot consider the publication to be of much importance one way or the other, for publication of election notices by the secretary of state is a purely ministerial act which has legal effect only as it complies with statutory or constitutional commands. The command of sec. 6.10 (1) to publish the amendment and explanation on the last Friday of September and once a week thereafter until election in November cannot by any rule of statutory construction breathe life into a publication made in February. We are compelled to hold that such publication by the secretary of state was not by or under direction of the legislature and was barren of any effect. It did not constitute part of the submission of the proposed amendment to the people and

the only contemporaneous way in which the legislature prescribed the manner of submission of this amendment dealt with the time of submission and the form of the question to be stated on the ballot."

The will of the electors as indicated by their ballots should not be defeated by a mere irregularity in the procedure of submission of the amendment. Under the circumstances here we cannot say that there was doubt or confusion in the minds of the electors when they voted.

The next two contentions made by the respondent require reference to sec. 1, art. XII, Const. That section, with emphasis added to the language referred to in those contentions, follows:

"CONSTITUTIONAL AMENDMENTS. *Section* 1. Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election; and if, in the legislature so next chosen, such *proposed amendment* or amendments *shall be agreed to* by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people *in such manner* and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendment separately."

The second contention of the respondent is that the amendment to sec. 3, art. XI, Const., was not validly adopted because the proposal embodied in Joint Resolution No. 12 in

1955 was not the same proposal as that embodied in Joint Resolution No. 47 of 1953, because the former contained the following provision not included in the latter:

"*Resolved,* That the change contemplated herein shall take effect with the assessment made May 1, 1955."

It will be noted that there were other differences in the two joint resolutions: Joint Resolution No. 12 adopted in 1955 first recites that an amendment to the constitution was proposed and agreed to by a majority of the members elected to each of the two houses. That was followed by a copy of sec. 3, art. XI, Const., with the proposed amendments. Following that were four resolutions. The first provided that the foregoing amendment was agreed to by the 1955 legislature. The second provided that the proposed amendment be submitted to a vote of the people at the election to be held on the first Tuesday of April, 1955. The third is the portion objected to, and the fourth directed the form of the question to be stated in the ballot.

The respondent cites cases holding that at the second session of the legislature each of the two houses must agree to the precise proposal agreed to at the previous session. Several Wisconsin cases so hold. The respondent concedes that the other additional matter that appeared in Joint Resolution No. 12 can be disregarded since such provisions only pertain to the time of the referendum and the form of the question to be stated in the ballot, and that these were necessary in order to submit the question to the people and did not vary the substance of the proposal before the legislature. The respondent contends that the provision making the change contemplated by the amendment effective with the assessment of May 1, 1955, is obscure and the reason for its inclusion is doubtful. The respondent doubts that it was intended thereby to establish an effective date of the amendment since an amendment becomes part of the constitution upon ap-

proval by the electors, and if such had been the intent it would have been simpler to say "This amendment shall take effect on May 1, 1955." The respondent continues, that if it was intended that the provision meant that the new computation of the debt limit afforded by the amendment was to be based upon assessments made May 1, 1955, a construction of the provision becomes more difficult since the new method of computing debt limit under the amendment is, by its terms, based on equalized value which, under the existing law or under subsequently enacted laws, is not computed on May 1 of each year. In spite of its doubt as to the meaning and intent of that provision, the respondent insists that it invalidates all of the proceedings because the proposals in the two joint resolutions were not the same.

Sec. 1, art. XII, Const., provides that the proposed amendment shall be agreed to by a majority of the members elected to each house at the subsequent session. The cases referred to by the respondent state that each of the two houses must agree to the precise proposal agreed to at the previous session. This means that the proposed amendment or amendments must be identical in the two joint resolutions. The constitution refers to the proposed amendment. Neither the constitutional provision nor the language in our decisions states that the joint resolutions must be identical. In fact, that would be impossible. There is no contention that sec. 3, art. XI, with the proposed amendment was different in any respect in the two resolutions. They were identical. Certainly the addition complained of could not postpone the effective date of the amendment. The constitution itself provides that if the people approve and ratify such amendment or amendments, they then become part of the constitution. Any attempt by the legislature to establish a later effective date of the amendment was beyond its power. The amendment went into effect and became a part of the constitution either on April 5, 1955, following the election, or on April 18, 1955, following

the certification of the vote by the board of canvassers. It is unnecessary to determine which was the effective date of the amendment. The sentence complained of can best be considered as explanatory matter. Its inclusion does not invalidate the amendment.

For its third contention the respondent claims that the amendment was not validly adopted and ratified because the legislature, in said Joint Resolution No. 12, made no provision as to the manner in which notice of such referendum was to be given. One of the questions raised in *State ex rel. Ekern v. Zimmerman*, 187 Wis. 180, 204 N. W. 803, involved the constitutionality of an amendment where the legislature, in its second joint resolution, did not prescribe the form of question in which the amendment should be submitted. It was there argued that the language of the constitution directing the legislature to submit an amendment *in such manner* as the legislature shall prescribe must be construed to mean that the legislature, in the resolution directing the submission, should prescribe the form in which the amendment be submitted. This court held otherwise in that case. It discussed and defined the word "manner" as used in the constitution, and held that secs. 6.10, 6.19, and 6.23, Stats., prescribed the method of procedure and mode of submission to be followed.

In *State ex rel. Thomson v. Zimmerman, supra,* this court held that sec. 6.10, Stats., applies only to November elections. Therefore the respondent contends that all of the general provisions of the statutes with reference to the submission of constitutional amendments refer only to elections held in November. Sec. 6.19 (6) clearly pertains to both elections in April and in November. Sec. 6.19 provides for the order in which the names of judicial candidates and candidates for state superintendent shall be placed upon the ballot. These are officers that are voted on only at a spring election. Sec. 6.21 refers to the manner and time of publication of election notices. Sec. 6.23 (8) expressly provides the form of ballot

■

to be used in all elections at which questions are submitted to the people.

We hold that the manner of submission of a constitutional amendment at a spring election is fully outlined by ch. 6, Stats., and that those statutes fully correspond and comply with the requirements of the constitution. We further hold that the constitutional amendment was submitted in compliance with those statutes and in compliance with the constitution.

The final contention of the respondent is that even if the amendment to sec. 3, art. XI, Const., has been validly adopted, the school district nevertheless remains without authority to incur indebtedness which, together with its outstanding indebtedness, will exceed the limitations of the section prior to the 1955 amendment. It argues that the debt-limitation provision of sec. 3, art. XI, does not constitute authority for school districts to incur indebtedness but is a limitation on the legislature. The authority to incur debt must come from the legislature. If the constitution permits the incurring of indebtedness up to five per cent of the equalized value, the school district may not incur such indebtedness until the legislature, by an appropriate statute, has authorized a school district to do so. Respondent claims that the attempt of the legislature by ch. 220, Laws of 1955, to authorize a different debt limitation is void and ineffectual. Said sec. 3, art. XI, as amended, provides that no school district shall become indebted in an aggregate amount exceeding five per cent of the value of the taxable property as equalized for state purposes, the manner and method of determining such equalization to be provided by the legislature. Ch. 220, Laws of 1955, merely provides for a method of determining value, but it is a value having no relationship to equalization. The respondent concludes that the state tax burden is apportioned to the counties upon the basis of the values determined by the county board pursuant to sec. 70.61, Stats.

Prior to the enactment of said ch. 220, Laws of 1955, sec. 70.57 (1), Stats., provided for the valuation by the department of taxation of all property in each county of the state. It was upon the valuation so determined that the forestry tax provided for in sec. 70.58, and which is the only state tax levied against property, was levied by the state. By ch. 220, Laws of 1955, the department of taxation is now required to value all of the property in each city, village, and town, as well as in each county. By sec. 70.60 the state taxes and special charges are determined and certified to each county clerk. This is the equalization by the state for state tax purposes. Secs. 70.61 and 70.62 provide for the distribution at the county level of the state taxes certified pursuant to sec. 70.60. Those sections provide for county equalization and are solely for county purposes. Prior to the adoption of said ch. 220, Laws of 1955, sec. 40.68 provided that the department of taxation should determine and certify to the state superintendent annually the full valuation in each school district and in each part of a joint school district.

Thus, prior to 1955, there were several statutory provisions whereby the department of taxation made equalized valuations in the various municipalities in the state for state purposes. These equalized valuations made by the department of taxation at full value have been used by the state for other state purposes. Illustrative thereof are various statutory provisions whereby state aid to schools is paid upon the basis of the equalized valuation of the property of the school district made by the department of taxation. It is probable, as contended by the respondent, that the valuation made by the department of taxation, which finds full value, and that made by the county boards may not be the same because they are made and used for entirely different purposes. However, the expression "the value of such property as equalized for state purposes" as used in the constitutional amendment being here considered has been commonly used and has been com-

monly understood. The constitutional amendment before us provides that the manner and method of determining the value of taxable property as equalized for state purposes be prescribed by the legislature. By prescribing in said ch. 220, Laws of 1955, that the value of the taxable property as equalized for state purposes be determined by the department of taxation according to its best judgment from all the sources of information available to it, there is a compliance with sec. 3, art. XI, Const., as amended in 1955.

*By the Court.*—It is declared and adjudged that the amendment to sec. 3, art. XI of the Wisconsin constitution which was ratified by the electors of the state at the April 5, 1955, election, and ch. 220, Laws of 1955, are valid; and that the loan to the school district, if made by respondent, will be a valid and binding obligation of the school district.