STATE of Wisconsin, Plaintiff-Respondent,

v.

Phillip COLE, Defendant-Appellant.

Supreme Court

*No. 01–0350–CR. Oral argument November 14, 2002.—Decided July 15, 2003.*

2003 WI 112

(Also reported in 665 N.W.2d 328.)

521

For the defendant-appellant there were briefs and oral argument by *Michael K. Gould,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. JON P. WILCOX, J. This case involves a constitutional challenge to Wis. Stat. § 941.23 (1999–2000),[1] the state law prohibition against carrying a concealed weapon. The challenge is brought by Phillip Cole, who was convicted under § 941.23 after police found two concealed weapons within the vehicle in which Cole was riding. Cole challenges the constitutionality of the concealed weapons statute in light of Article I, Section 25 of the Wisconsin Constitution, which guarantees citizens' state constitutional right to bear arms. He claims that the statute is unconstitutional on its face and as applied to him.

¶ 2. Before trial, Cole pled guilty to the concealed weapons charge and a drug charge. After he was sentenced, Cole filed a motion to vacate the concealed weapons conviction on the basis that Wis. Stat. § 941.23 violates Article I, Section 25 of the Wisconsin Constitution. The postconviction motion was denied. Cole appealed and the court of appeals certified the matter to this court. We accepted certification, and we now uphold the decision of the circuit court.

I

¶ 3. The facts of this case are not in dispute. On the evening of November 6, 1999, Milwaukee police officers pulled over a vehicle driven by Minko Lewis for an expired registration and a defective brake lamp. Phillip Cole, the defendant in this case, was a passenger

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

in the vehicle. As one of the officers approached the vehicle, he saw Cole conceal an item in the glove compartment. Police searched Cole and the vehicle. Officers found marijuana in Cole's left breast pocket. Police also found a loaded .380 caliber pistol in the glove compartment of the vehicle and a loaded .45 caliber semi-automatic pistol beneath the driver's seat. Cole told police that the marijuana was for personal use and that he carried the .380 in the glove compartment for protection.

¶ 4. On May 12, 2000, Cole pled guilty to charges of carrying a concealed weapon (CCW) in violation of Wis. Stat. § 941.23 and possession of tetrahydrocannabinols (marijuana) in violation of Wis. Stat. § 961.41(3g)(e).[2] The Milwaukee County Circuit Court, the Honorable Maxine A. White, presiding, sentenced Cole to 60 days on the CCW charge and 15 days (concurrent) on the possession charge with Huber privileges.

¶ 5. On September 29, 2000, Cole filed a motion to vacate his conviction on the concealed weapons charge, alleging that the CCW statute is an unconstitutional infringement of his constitutional right to bear arms. The state constitutional right to bear arms is found in Article I, Section 25 of the Wisconsin Constitution and provides as follows: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." Wis. Const. art. I, § 25. Section 941.23 of the Wisconsin Statutes, which Cole claims violates that provision, states: "Any person

---

[2] Wisconsin Stat. § 961.41(3g)(e) provides:

If a person possesses or attempts to possess tetrahydrocannabinols included under s. 961.14(4)(t), or a controlled substance analog of tetrahydrocannibinols, the person may be fined not more than $1,000 or imprisoned for not more than 6 months or both.

except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."

¶ 6. The Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr., presiding, denied the postconviction motion, finding the statute to be constitutional. Cole appealed and on October 23, 2001, the court of appeals certified the matter to this court. This court then accepted certification on November 27, 2001.

¶ 7. This case was originally scheduled to be decided as a companion case to *State v. Gonzales*, 2002 WI 59, 253 Wis. 2d 134, 645 N.W.2d 264. After oral argument in *Gonzales*, this court decided *Gonzales* on alternative grounds, finding that Gonzales' challenge to Article I, Section 25 of the Wisconsin Constitution failed because the amendment was not in effect on the day the defendant violated Wis. Stat. § 941.23. In an order dated June 13, 2002, this court then determined that *State v. Cole* would be held and heard with *State v. Hamdan*, 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785.

## II

¶ 8. The Wisconsin Legislature first passed a concealed weapons law in 1872. § 1, ch. 7, Laws of 1872; *see also State v. Dundon*, 226 Wis. 2d 654, 671, 594 N.W.2d 780 (1999). As noted in *Dundon*, the original statute contained several exceptions to the prohibition that were then repealed in 1878.[3] *Dundon*, 226 Wis. 2d at

---

[3] In 1878, the statute, then Wis. Stat. § 4397, provided:

Any person who shall go armed with any concealed and dangerous weapon, shall be punished by imprisonment in the county jail not more than six months, or by fine not exceeding one hundred

671–72. Since 1878, the CCW statute has remained substantively the same, including only an exception for peace officers.[4] *Id.* at 672.

¶ 9. Article I, Section 25 of the Wisconsin Constitution was adopted by the citizens of this state in November 1998. Jeffrey Monks, Comment, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 250. It became effective on November 30, 1998. *See Gonzales,* 253 Wis. 2d 134, ¶¶ 8–9, 15, 29–30. The amendment was approved by a wide margin in the state

dollars: provided, this section shall not apply to any policeman or officer authorized to serve process.

*State v. Dundon,* 226 Wis. 2d 654, 672, 594 N.W.2d 780 (1999) (quoting Wis. Stat. ch. 181, § 4397 (1878)).

[4] *Dundon* provides a summary of much of the history of Wis. Stat. § 941.23. There the court noted:

Section 4397 was renumbered as Wis. Stat. § 340.69 in 1925. § 1, ch. 4, Laws of 1925. In 1953, the legislature repealed § 340.69 and adopted Wis. Stat. § 341.23, a statute very similar to the current statute. § 2, ch. 623, Laws of 1953. In 1955, this statute was repealed and renumbered, with minimal changes, as the current Wis. Stat. § 941.23. § 1, ch. 696, Laws of 1955.

*Dundon,* 226 Wis. 2d 654, 672.

In 1969, Wis. Stat. § 941.23 was split into subsections. §§ 1, 2, ch. 272, Laws of 1969. Subsection 1 was substantially the same as what is now the complete statute. In 1977, the legislature amended subsection 1 to change the language from a term of imprisonment to a level of offense, stating that a person going armed with a concealed weapon is "guilty of a Class A misdemeanor." § 37, ch. 173, Laws of 1977. In 1979, the legislature repealed subsection 2 and renumbered Wis. Stat. § 941.23(1) to be simply Wis. Stat. § 941.23, the present statute. *See* §§ 843g, 843j, ch. 221, Laws of 1979.

legislature both times it arose for consideration.[5] *Bulletin of the Proceedings of the Wisconsin Legislature, 1995–96 Assemb. Sess.,* at 394–95; *Bulletin of the Proceedings of the Wisconsin Legislature, 1997–98 Assemb. Sess.,* at 316–17; Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 250 n.10. When put before the voters, the amendment passed with 74% voting in favor of the amendment. Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 250 n.10. That is not to say, however, that this amendment passed into law without notice. In fact, some controversy surrounded the proposed measure and its implications. *See, e.g., Monks, The End of Gun Control,* 2001 Wis. L. Rev. 249 (citing numerous news articles and editorials with a variety of positions on the proposed amendment); Christopher R. McFadden, *The Wisconsin Bear Arms Amendment and the Case Against an Absolute Prohibition on Carrying Concealed Weapons,* 19 N. Ill. U. L. Rev. 709 (1999).

### III

¶ 10. We first address the standards of review applicable in this case. The constitutionality of a statute presents a question of law that this court reviews de

---

[5] Under Article XII, Section 1 of the Wisconsin Constitution, a proposed constitutional amendment must be considered and approved by two successive legislatures before it is presented to the public for referendum approval. Wisconsin Briefs, *Constitutional Amendments to be Considered by the Wisconsin Voters, November 3, 1998,* LRB-98–WB-10, at 1 (September 1998). The proposed right to bear arms amendment received "first consideration" during the 1995–96 session of the legislature and "second consideration" during the 1997–98 legislature. *See Bulletin of the Proceedings of the Wisconsin Legislature, 1995–96 Assemb. Sess.,* at 394–95; *Bulletin of the Proceedings of the Wisconsin Legislature, 1997–98 Assemb. Sess.,* at 316–17.

novo, without deference to the decisions of the circuit court or the court of appeals.[6] *Aicher v. Wis. Patients Comp. Fund,* 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849; *State v. Post,* 197 Wis. 2d 279, 301, 541 N.W.2d 115 (1995); *Szarzynski v. YMCA, Camp Mini-kani,* 184 Wis. 2d 875, 883–84, 517 N.W.2d 135 (1994); *State v. Fisher,* 211 Wis. 2d 665, 669, 565 N.W.2d 565 (Ct. App. 1997); *Prof. Guardianships, Inc. v. Ruth E.J.,* 196 Wis. 2d 794, 801, 540 N.W.2d 213 (Ct. App. 1995). This case requires us to interpret the constitutional amendment, seeking an indication of the framers' intentions. As we have noted:

> The purpose of construction of a constitutional amendment is to give effect to the intent of the framers and of the people who adopted it; and it is a rule of construction applicable to all constitutions that they are to be construed so as to promote the objects for which they were framed and adopted.

*Kayden Indus., Inc. v. Murphy,* 34 Wis. 2d 718, 729–30, 150 N.W.2d 447 (1967) (quoting *Ekern v. Zimmerman,* 187 Wis. 180, 184, 204 N.W. 803 (1925)) (internal citations and quotations omitted). For these purposes, this court has established that we should utilize three sources to determine a provision's meaning:

> the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption.

---

[6] Regardless of whether the defendant waived the issue, this court may, in its discretion, address the important constitutional issue raised herein.

*Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996) (citations omitted).

¶ 11. Generally, legislative enactments are entitled to a presumption of constitutionality. *Aicher,* 237 Wis. 2d 99, ¶ 18; *Thompson,* 199 Wis. 2d at 680; *Davis v. Grover,* 166 Wis. 2d 501, 520, 480 N.W.2d 460 (1992); *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973) ("This court has often affirmed the well-established presumption of constitutionality that attaches itself to all legislative acts."); *Ruth E.J.,* 196 Wis. 2d at 801. This court has repeatedly held that it "indulges every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality." *Aicher,* 237 Wis. 2d 99, ¶ 18 (internal citation omitted); *see also Post,* 197 Wis. 2d at 301. A petitioner seeking to prove a statute unconstitutional faces a heavy burden. *State v. Interstate Blood Bank, Inc.,* 65 Wis. 2d 482, 488–89, 222 N.W.2d 912 (1974). In the face of a strong presumption, it falls to the party challenging the constitutionality of a statute to prove that the statute is unconstitutional beyond a reasonable doubt. *Aicher,* 237 Wis. 2d 99, ¶ 19; *Brandmiller v. Arreola,* 199 Wis. 2d 528, 536, 544 N.W.2d 894 (1996); *Thompson,* 199 Wis. 2d at 680; *Fisher,* 211 Wis. 2d at 669. This court has noted: "It is insufficient to merely establish doubt as to an act's constitutionality nor is it sufficient to establish the act is probably constitutional." *Quinn v. Town of Dodgeville,* 122 Wis. 2d 570, 577, 364 N.W.2d 149 (1985). If any doubt remains, this court must uphold the statute as constitutional. *Id.*

¶ 12. Cole argues that the presumption of constitutionality is inapplicable in this case because the CCW statute predates the constitutional amendment. We disagree. The purpose of the presumption of constitutionality does not appear to have any relation to whether the statute predates or postdates the constitutional provision. As this court has held: "The presumption of statutory constitutionality is the product of our recognition that the judiciary is not positioned to make the economic, social, and political decisions that fall within the province of the legislature." *Aicher,* 237 Wis. 2d 99, ¶ 20. Whether a statute predates or postdates a constitutional amendment, the legislature is still the more appropriate body for those considerations, and the judiciary rightly presumes the legislature makes such an assessment.

¶ 13. Rare exceptions to the presumption have been found, particularly where a statute infringes upon First Amendment rights or the process of enactment is suspect. *See State v. Weidner,* 2000 WI 52, ¶ 7, 235 Wis. 2d 306, 611 N.W.2d 684; *City of Oak Creek v. DNR,* 185 Wis. 2d 424, 437, 518 N.W.2d 276 (Ct. App. 1994) ("Although a statute generally enjoys a strong presumption of constitutionality, an exception to the rule occurs when the behavior of the legislature allegedly violates a law mandating the form in which bills must be enacted." (citation omitted)).[7] Even in cases such as *Davis,*

---

[7] See also *Davis v. Grover,* 166 Wis. 2d 501, 520–21, 480 N.W.2d 460·(1992), in which this court found a presumption of constitutionality appropriate where legislature could be presumed to have "intelligently participate[d] in considering" the relevant bill (citations omitted). In that case, the court was concerned about violation of the procedural requirements of Wisconsin Constitution Article IV, Section 18. *Id.* at 522.

though, where the court was concerned about the procedures of the legislature, the court noted: "If such legislation is passed after full consideration . . . that will be the proper time to engage in the presumption of constitutionality." *Davis,* 166 Wis. 2d at 524 (internal citation and supplied emphasis omitted).

¶ 14. Cole cites to *Kayden Industries* and *Schmeling v. Phelps* to support his argument that because the amendment came into being after the statute, it should not be entitled to a presumption of constitutionality. We find both of these cases inapposite on this particular point. As noted by the State, *Kayden* has to do with the result when a new constitutional amendment is inconsistent with prior statutes and common law. *See Kayden,* 34 Wis. 2d at 731. The effect is to repeal the statute. *Id.* This result, however, has nothing to do with whether or not a party challenging constitutionality of a statute is relieved of the burden of overcoming a presumption of constitutionality. The main issue in this case is whether or not the statute is, in fact, inconsistent with the constitutional amendment. To accept Cole's interpretation of *Kayden* would be to skip over the process of determining inconsistency and actually create the opposite presumption. Regarding Cole's employment of *Schmeling,* we agree with the State's assertion that chronology did not dictate the result in that case. In *Schmeling v. Phelps,* 212 Wis. 2d 898, 909, 569 N.W.2d 784 (Ct. App. 1997), the court of appeals found that where there is a conflict between the language of a statute and the language of the constitution, the language of the constitution prevails. The court of appeals stated:

> The constitution or a constitutional amendment is of the highest dignity and prevails over legislative acts and court rule to the contrary. Ordinary acts of the

legislature, *whether adopted before or after the date of the constitution,* cannot be given effect if to do so would contravene a substantive provision in the constitution.

*Id.* at 908–09 (internal quotations and citations omitted) (emphasis added). The presumption was never an issue in *Schmeling.* As in *Kayden,* the issue in *Schmeling* was the proper interpretation when a conflict exists, not the method of ascertaining if there is a conflict at all. Similarly, in *La Follette v. Board of Supervisors of Milwaukee County,* 109 Wis. 2d 621, 629, 327 N.W.2d 161 (Ct. App. 1982), the court of appeals found that where statutes predated a constitutional provision and directly conflicted with the constitutional provision, the constitution prevailed over the statutes. If a conflict exists, it is clear that the constitutional amendment prevails over the inconsistent statute, but before that determination is made, as in this case, Cole has provided no reason to reject the presumption of constitutionality in this context.

■

¶ 15. Cole also cites *City of Princeton v. Buckner,* 377 S.E.2d 139 (W. Va. 1988), for the proposition that other states have rejected a presumption of constitutionality in similar contexts. In *Buckner,* 377 S.E.2d at 144, the Supreme Court of Appeals of West Virginia held: "A constitutional amendment will supersede any inconsistent portions of antecedent constitutional or statutory provisions, as 'the latest expression of the will of the people.' " (internal citations omitted). We find *Buckner* to be similar to *Schmeling* and *Kayden. Buckner* does not discuss the presumption of constitutionality; rather, it describes the effects if inconsistency exists, a very different question. The application of a presumption of constitutionality does not mean a stat-

ute will always survive judicial scrutiny. Even if a statute is presumed constitutional, it will fall if found to be inconsistent with the mandates of the constitution. However, such a conclusion results from overcoming the presumption of constitutionality, not from refusing to apply it.

¶ 16. While we have found the cases cited above to be unhelpful, at least one other state has dealt with this type of situation in the context of gun control laws and applied a presumption of constitutionality. In *State v. Comeau,* 448 N.W.2d 595 (Neb. 1989), the Supreme Court of Nebraska recognized a presumption of constitutionality even where the statute at issue predated the constitutional amendment granting the right to bear arms. Nebraska's "Right to Bear Arms" amendment was adopted at the general election in 1988. *Id.* at 596. The gun control statutes at issue in the case were all in effect prior to that, yet the court stated: "It is fundamental that a statute is presumed to be constitutional, and the burden of establishing unconstitutionality is on the party attacking its validity." *Id.* That court went on to uphold the constitutionality of the statutes. *Id.* at 600.

¶ 17. This court has consistently used broad language in describing the presumption of constitutionality. Also, we have reaffirmed time and again the general rule that a presumption exists. For example, in *Hammermill,* this court, quoting Wisconsin precedent, stated: "*All* legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law if at all possible." *Hammermill,* 58 Wis. 2d at 47 (internal quotations omitted) (emphasis added). In *Ruth E.J.,* 196 Wis. 2d at 801, the court of appeals stated: "We presume *all* statutes are constitutional . . . " (internal citation omitted) (emphasis

added). Further, this court has specifically held: "*All* statutes passed and retained by the legislature should be held valid unless the earlier statute is completely repugnant to the later enactment." *State v. Zawistowski,* 95 Wis. 2d 250, 264, 290 N.W.2d 303 (1980) (emphasis added). It is doubtful, if not inconceivable, that persistent use of such broadly inclusive language has been unintentional. It has been firmly established that "the legislature is presumed to act with full knowledge of existing laws." *State v. Roling,* 191 Wis. 2d 754, 762, 530 N.W.2d 434 (Ct. App. 1995). Consequently, we find, as the circuit court did, that the legislature here did not act in a vacuum, but with knowledge of the many existing gun control laws, including the concealed weapons statute.[8]

¶ 18. Given the above analysis demonstrating the general rule favoring application of the presumption and, in addition, finding no valid reason to reject the presumption in this context, we hold that it is appropriate to apply a presumption of constitutionality in this case. As we have noted:

> We as a court are not concerned with the merits of the legislation under attack. We are not concerned with the wisdom of what the legislature has done. We are judicially concerned only when the statute clearly contravenes some constitutional provision.

*Hammermill,* 58 Wis. 2d at 47 (internal quotations omitted). We again noted in *Aicher,* 237 Wis. 2d 99,

---

[8] Actually, many of these laws provided fodder for the debate over the proposed amendment. *See* Jeffrey Monks, Comment, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 249–50 n.3–6, 8–9.

¶ 20, that the duty of the court is only to determine whether a statute "clearly and beyond doubt" offends constitutional protections. The presumption of constitutionality promotes due deference to acts of the legislature.

¶ 19. Cole next argues that this court should apply strict scrutiny, or at least intermediate scrutiny, in determining the constitutionality of Wis. Stat. § 941.23, because the right to bear arms is a fundamental constitutional right. The State questions whether the right to bear arms is fundamental and asserts that because of the compelling public health and safety reasons for the CCW statute, a reasonableness standard is appropriate. The State notes the reasonableness standard is what most other states have used.

¶ 20. We find that the state constitutional right to bear arms is fundamental. It is indeed a rare occurrence for the state constitution's Declaration of Rights to be amended. *See* Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 249. Article I, Section 25 explicitly grants a right to bear arms. Further, there is evidence in the legislative history of the amendment that it was intended to grant a "fundamental individual" right. *See* Memorandum from Shaun Haas, Senior Staff Attorney, Wis. Legislative Council, *Analysis of 1995 Assembly Joint Resolution 53 and 1995 Senate Joint Resolution 7, Relating to the Right to Keep and Bear Arms (First Consideration) to Wisconsin State Representative David Travis and Interested Legislators,* at 6 (Oct. 11, 1995) (hereinafter 1995 LCS Memorandum).

¶ 21. Nevertheless, we do not agree with Cole's position that strict scrutiny or intermediate scrutiny is required in this case. This court has previously recognized that it need not apply strict scrutiny every time a

governmental burden upon fundamental rights is implicated. *Brandmiller,* 199 Wis. 2d at 541. In *Brandmiller,* this court used an intermediate level of scrutiny, rather than strict scrutiny, to examine the constitutionality of municipal ordinances that prohibited "cruising" on certain city streets, despite the possible implications upon the fundamental constitution right of travel. *Id.* at 537–42. We find the precedents of other states, favoring a "reasonable" test, to be persuasive in the context of the right to bear arms.

¶ 22. Generally, when other courts have evaluated challenges to the validity of gun control statues under state constitutional provisions, the test has been whether the statute constitutes a "reasonable regulation" in light of the state's police powers. *See, e.g., People v. Swint,* 572 N.W.2d 666 (Mich. Ct. App. 1997); *State v. Ricehill,* 415 N.W.2d 481 (N.D. 1987). "Police power" is an inherent authority of state governments. *Reginald D. v. State,* 193 Wis. 2d 299, 308, 533 N.W.2d 181 (1995); *Interstate Blood Bank,* 65 Wis. 2d at 490; Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 259 n.69. It covers "all matters having a reasonable relation to the protection of the public health, safety, or welfare." *Carnation Milk Prods. Co. v. Emery,* 178 Wis. 147, 153, 189 N.W. 564 (1922).

¶ 23. Even courts that have found such a right to be fundamental have used a reasonableness standard. *See, e.g., Arnold v. Cleveland,* 616 N.E.2d 163 (Ohio 1993). If this court were to utilize a strict scrutiny standard, Wisconsin would be the only state to do so. Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 291. We decline such an invitation, because we agree with the courts of various other states that the proper

question is whether the statute is a reasonable exercise of police power. As noted by Monks: "This standard of review is relatively deferential and generally distinct from the type of review that challenges under other constitutional rights receive." *Id.* at 259. We are persuaded that this standard is appropriate because the interests of public safety involved here are compelling. *See id.* at 259 n.69–70 (and cases cited therein).

¶ 24. Cole acknowledges that the right to bear arms is not absolute. Cole has conceded that some regulation is appropriate, but insists that the prohibition of all concealed weapons extends too far and impermissibly infringes the constitutional right. In the process of drafting Article I, Section 25, the legislature was made aware that "no current state constitutional provision guaranteeing the right to keep and bear arms has been found to create an absolute right." 1995 LCS Memorandum, at 13. Further, it has been noted: "[E]ven in the absence of such specific authorization [for legislative control], the judiciary has long recognized that the exigencies of society require limits on the scope of the arms right. Michael D. Ridberg, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation,* 38 U. Chi. L. Rev. 185, 187 (1970).

¶ 25. There are few, if any, absolute rights. As this court recognized long ago: "Indeed, most of the legislative acts which fill our statute books detract in some measure from the absolute freedom of the individual to act wholly at the dictate of his will, and yet are of either decided or fully recognized constitutionality." *Zillmer v. Kreutzberg,* 114 Wis. 530, 533, 90 N.W. 1098 (1902). Further,

> [t]he very existence of government renders imperative a power to restrain the individual to some extent. This

> is called the "police power" .... It may be described,
> though not defined, as the power of the government to
> regulate conduct and property of some for safety and
> property of all.

*Id.* at 536–37. Moreover, this authority to enact legislation using police power has been held to "embrace every law or statute which concerns the whole or any part of the people . . . ." *Id.* at 154. As noted by the court of appeals in *Fisher,* 211 Wis. 2d at 672, even fundamental rights are subject to reasonable regulation to protect legitimate public interests. The Nebraska Supreme Court agreed: "There are very few rights which are absolute, and this is of necessity. In every phase of everyday experience, there are extremes beyond which some restraint or regulation is necessary for the common good." *Comeau,* 448 N.W.2d at 597.

¶ 26. Although Article I, Section 25 creates a fundamental right, as the above analysis shows, such a right is still subject to reasonable restriction. As such, we find the correct test to be whether or not the restriction upon the carrying of concealed weapons is a reasonable exercise of the State's inherent police powers. Such a test should not be mistaken for a rational basis test. The explicit grant of a fundamental right to bear arms clearly requires something more, because the right must not be allowed to become illusory. *See State v. Reid,* 1 Ala. 612 (1840); *Benjamin v. Bailey,* 662 A.2d 1226, 1234 (Conn. 1995); *State v. Ricehill,* 415 N.W.2d 481, 483 (N.D. 1987); *State v. McAdams,* 714 P.2d 1236, 1237 (Wyo. 1986). Monks has described the difference:

> When a state has a right to bear arms amendment, the
> test generally changes from "Is it a 'reasonable' means
> of promoting the public welfare?" to "Is it a 'reasonable'
> limitation on the right to bear arms?"

Monks, *The End of Gun Control*, 2001 Wis. L. Rev. at 275 n.147; *see also Benjamin*, 662 A.2d at 1234 ("The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of a mere rational reason for restricting legislation.").

¶ 27. As we have noted, numerous other jurisdictions have applied a reasonableness test. *See, e.g., People v. Atencio*, 878 P.2d 147, 149–50 (Colo. Ct. App. 1994); *Rawlings v. Illinois Dep't of Law Enforcement*, 391 N.E.2d 758, 762–63 (Ill. App. Ct. 1979); *Ricehill*, 415 N.W.2d at 483; *State v. Boyce*, 658 P.2d 577, 579 (Or. Ct. App. 1983); *McAdams*, 714 P.2d at 1237. We agree that the reasonableness test is appropriate. Under circumstances such as those in this case, the reasonableness test focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare. *See State v. Hamdan*, 264 Wis. 2d 433, ¶¶ 40–41, 45 (describing application of the reasonableness standard and various other cases applying the standard); Ridberg, *Impact of Right to Bear Arms Provisions*, 38 U. Chi. L. Rev. at 202–03 ("The scope of permissible regulation in states with arms provisions is dependent upon a balancing of the public benefit to be derived from the regulation against the degree to which it frustrates the purpose of the provision.").[9]

---

[9] Michael D. Ridberg, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation*, 38 U. Chi. L. Rev. 185, 187–88 (1970), also notes, regarding the test to apply, that "[t]he range of legislation permissible under the police power is restricted by the notion of reasonableness; both the goals of legislation and the means chosen to achieve those goals must be reasonable in light of the public welfare."

¶ 28. Having laid out the appropriate standards for our analysis, we move now to application of the test. We face the same task many other state courts have already taken on—to determine whether, in balancing the authority of the state to enact legislation for the health, safety and welfare of the public as implemented here through the CCW statute against the right to bear arms, the legislature has gone too far and unreasonably impinged the constitutional right to bear arms. *See, e.g., Dano v. Collins,* 802 P.2d 1021 (Ariz. Ct. App. 1991) (concluding that the prohibition of concealed weapons does not frustrate that state's constitutional right to bear arms). We conclude that the CCW statute is a reasonable regulation on the time, place, and manner in which the right to bear arms may be exercised. It does not unreasonably infringe upon a citizen's ability to exercise the right.

¶ 29. First, based on the text of the constitution and the legislative history of the amendment, we note our agreement with both parties that Article I, Section 25 of the Wisconsin Constitution grants an individual, rather than a collective, right.[10] As already noted, we

---

[10] *See* Memorandum from Shaun Haas, Senior Staff Attorney, *Explanation of 1997 Assembly Joint Resolution 11, Relating to the Right to Keep and Bear Arms (Second Consideration) to Interested Legislators,* at 2 (January 22, 1997). The 1997 Memorandum to legislators explained the importance of a change that had been made in the language of the proposed constitutional amendment, stating:

Assembly Substitute Amendment 1 substituted the phrase "The people" for the phrase "Every individual" in order to avoid a

accept the proposition that the right to bear arms amendment recognized a fundamental right.

■

¶ 30. A "facial" challenge to the constitutionality of a statute means that the "challenger must establish, beyond a reasonable doubt, that there are no possible applications or interpretations of the statute which would be constitutional." *State v. Wanta,* 224 Wis. 2d 679, 690, 592 N.W.2d 645 (Ct. App. 1999). Cole asserts that the CCW statute is facially unconstitutional for two reasons: 1) because the amendment and the statute are incompatible, the amendment effectively repeals the statutory restriction; and 2) the statute is too broad and not narrowly tailored to serve its purpose

> possible construction of the constitutional amendment that would preclude the Legislature, in the exercise of its inherent police power to enact laws that limit or infringe upon the right to keep and bear arms, from restricting the possession and use of arms by certain individuals (e.g., convicted felons) in the interest of protecting the health, safety or welfare of the public.

*Id.* Monks provides two additional reasons for this conclusion:

> . . . [I]n the cases where "the people" was construed as meaning only an aggregate, the court also relied on other words in the amendment to reach this conclusion, such as references to a "militia" or to the "common defense." No such reference is found in the Wisconsin amendment. Rather the enumerated purposes found in the amendment, such as "hunting" and "recreation" suggest that an individual right was intended.

> Third, and perhaps most important, a right is conferred to "the people" in two other places in the Declaration of Rights. Both the amendment guaranteeing protection against unreasonable searches and seizures and the right to assemble and petition use "the people" rather than "person" or "individual." As both of these amendments convey individual rights, this suggests that the right to bear arms does as well.

Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 268–69.

and as such is an unconstitutional assertion of the state's police power that severely infringes citizens' fundamental right to bear arms. We find that both claims fail.

■

¶ 31. In interpreting a constitutional provision, we first turn to the plain meaning of the amendment in context. Cole argues that the plain language of the amendment is unambiguous and clearly incompatible with the broad prohibition upon carrying concealed weapons in Wis. Stat. § 941.23. As such, he argues, the statute is effectively repealed. However, both parties in this case have "read in" exceptions to the text of the amendment.[11] Again, Cole does not argue that the right to bear arms is absolute. Because the parties agree, as do we, that the right is necessarily and appropriately limited to some extent by the state's inherent police powers, we cannot agree that the plain language of the constitutional amendment and the statute are incompatible. Whether the restriction is too broad to be "reasonable" is another question, but we do not find any indication in the plain language of the amendment that the CCW statute was effectively repealed.

¶ 32. Cole points out that the right to bear arms amendments in many states explicitly leave open the possibility of legislative restriction, some even specifically singling out restrictions upon carrying concealed weapons. *See, e.g.,* Colo. Const. art. II, § 13 (2002); Fla. Const. art. I, § 8(a) (2002); Ill. Const. art. I, § 22 (2000). We are not persuaded that the absence of such language

---

[11] At oral argument, Chief Justice Abrahamson noted that although Cole requests the court to decide based only on the plain language of the amendment, both sides actually read the text of the amendment to have implied exceptions.

in Article I, Section 25 prevents such restrictions in Wisconsin. As discussed, police powers are inherent in the State's authority. An early draft of the amendment actually contained an explicit reservation of the State's right to regulate the manner of bearing arms. *See* 1995 LCS Memorandum, at 3. As noted at that time, such an explicit grant of authority "amounts merely to a *recognition of the state's inherent police power* to protect the health, safety and welfare of the public." *Id.* at 7 (emphasis added). The Legislative Council Staff (LCS) concluded that such police powers could be exercised regardless of express authority. *Id.* at 7, 10. We agree. As one article stated, these express qualifications "may be aptly characterized as manifestations of 'superabundant caution.' " Ridberg, *Impact of Right to Bear Arms Provisions,* 38 U. Chi. L. Rev. at 189.

¶ 33. Other states have found that CCW statutes can coexist with a constitutional right to bear arms, holding the laws to be reasonable time, place, and manner restrictions. In *McAdams,* 714 P.2d at 1236–37, for example, a Wyoming defendant raised a plain language argument much like the one presented by Cole. The Wyoming Constitution, Article I, Section 24 provides: "The right of citizens to bear arms in defense of themselves and of the state shall not be denied." *See McAdams,* 714 P.2d at 1236 (quoting Wyo. Const. art. I, § 24). Section 6–8–104(a) of the Wyoming Statutes states, in relevant part, that "[a] person who wears or carries a concealed deadly weapon is guilty of a misdemeanor." *Id.* (quoting § 6–8–104(a) of the Wyoming Statutes). McAdams was pulled over and during the course of the stop, officers noticed she had a knife in a sheath in the breast pocket of her jacket. *Id.* McAdams claimed that the "plain language of Article I, Section 24 of the Wyoming Constitution leaves no room

for restricting the manner of bearing arms." *Id.* at 1237. The Supreme Court of Wyoming rejected this argument and upheld the regulation as a valid time and manner restriction. *Id.* at 1238.

¶ 34. The *McAdams* case also supports the conclusion that the CCW statute is sufficiently narrow. As we have discussed, the CCW statute must be "reasonable" restriction upon the right to bear arms in order to pass constitutional muster. This requires us to balance the interests involved. In *McAdams,* the court aptly noted: "The police power cannot . . . be invoked in such a manner that amounts to the destruction of the right to bear arms." *Id.* at 1237. In balancing the individual's constitutional right against the interest of society in enacting laws to "ensure some semblance of order," the court found that the concealed weapons statute did impose a limitation upon the right to bear arms, but that it constituted a reasonable restraint in light of the objectives of the statute. *Id.* at 1237–38. Similarly, in *Dano,* 802 P.2d at 1022, the Arizona Court of Appeals found that the constitutional right to bear arms is not unlimited and that "[t]he right to bear arms in self-defense is not impaired by requiring individuals to carry weapons openly." Article II, Section 26 of the Arizona Constitution provides: "The right of the individual citizen to bear arms in defense of himself or the State shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain, or employ an armed body of men." Ariz. Const. art. II, § 26 (2000). Note that neither the Wyoming nor Arizona Constitution has an explicit grant of authority to restrict concealed weapons, yet courts in both states found restrictions to be a valid exercise of police power.

546

¶ 35. Our examination of the plain language of Article I, Section 25 and similar provisions in other states supports our conclusion that the CCW statute is not effectively repealed by the right to bear arms amendment and that such a prohibition is a reasonable time, place, and manner restriction upon the right.

¶ 36. We next examine the legislative history of the amendment. The drafting records related to the right to bear arms amendment are informative. The amendment passed first consideration of the legislature in 1995. 1995 Enrolled Joint Resolution 27. In 1997, the second consideration was approved and the amendment moved to the voters for ratification. 1997 Assembly Joint Resolution 11. During this process, the Legislative Reference Bureau (LRB) and the Legislative Council Staff (LCS) authored several analyses related to the amendment to assist the legislature.[12] The 1995 LCS

---

[12] The Legislative Reference Bureau is deeply involved in the legislative drafting process, as LRB attorneys draft all bills and resolutions that are introduced into the legislature. *See* Wisconsin Briefs, *Guide to Researching Wisconsin Legislation,* LRB-98–WB-8, at 1 (August 1998). The LRB also maintains a library collection with publications and records specifically intended to assist with researching legislative history. *See id.*

The Legislative Council Staff also assists the legislature. LCS is a nonpartisan legislative service agency of the state legislature. *See* Joint Legislative Council, *Legislative Council Staff,* at http://www.legis.state.wi.us/lc/staff_list.htm (last visited Mar. 9, 2003). LCS is responsible for a variety of research services, including responding to requests for research and information from members of the legislature, legislative staff, other governmental agencies, and other state legislatures. *Id.*

While the research done by these agencies is not necessarily dispositive in determining legislative intent, their analyses at the time of drafting certainly provides the court with valuable information about the knowledge available to legislators. Fur-

547

Memorandum, written for a particular representative and any "interested legislators," extensively analyzed the proposed constitutional amendment, including a summary of amendments and relevant case law from other states. 1995 LCS Memorandum. As we have already noted, LCS concluded that an amendment explicitly retaining for the legislature the right to regulate the manner of bearing arms was redundant. *Id.* at 7. The LCS memo stated: "That is, regardless of this express authority to enact laws, the police power of the state, which is vested in the Legislature, could be exercised to limit both the constitutional right to keep arms and the right to bear arms." *Id.* This memo also noted that courts in Nebraska, North Dakota, and Ohio had all found the right to bear arms to be subject to reasonable regulation because important public safety interests were involved. *Id.* at 7–10. The provision of the amendment regarding "manner" was eventually taken out. Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 275–76 (describing changes made during the amendment process). The conclusion of the 1995 LCS Memorandum is of particular interest:

> Because the inherent authority of the state to protect its citizens through the proper exercise of its police power, it is unlikely that any of the current laws regulating or restricting either the possession or carrying of firearms is in serious jeopardy of being invalidated as an infringement of the proposed constitutional right. A review of court decisions in other states with

---

ther, the legal expertise of these agencies entitles their analysis to some consideration by this court. In this case, for example, both agencies provided extensive research to legislators during the drafting process. They examined the laws of other states and explained the potential effects of particular language. *See, e.g.,* 1995 LCS Memorandum.

constitutional provisions securing the right to keep and bear arms discloses that courts are very willing to uphold reasonable firearms restrictions.

1995 LCS Memorandum at 13–14. Clearly, the legislature knew gun control laws existed and this memo shows that they also had reason to believe the passage of Article I, Section 25 would not impact the status of those laws.[13]

¶ 37. A drafting memo by the LRB, authored by Jefren Olsen and attached to the 1995 LCS Memorandum, also supports the proposition that the legislature intended gun control legislation, including the concealed weapons law, to survive the new constitutional right to bear arms. This memo stated: "Another example of a restriction that is generally held to be reasonable is the prohibition on carrying concealed weapons." Drafter's Note, LRB-4287/ldn at 3, reprinted as attachment to 1995 LCS Memorandum.

¶ 38. A 1997 LCS memo reiterates the assertions of these previous memos. Shaun Haas, Wisconsin Legislative Council Staff Memorandum, *Explanation of 1997 Assembly Joint Resolution 11, Relating to the Right to Keep and Bear Arms (Second Consideration)* (January 22, 1997). In 1998, the LRB again analyzed the proposed amendment shortly before it went before the public for a vote. *See* Wisconsin Briefs, *Constitutional Amendments to be Considered by the Wisconsin Voters, November 3, 1998,* LRB-98–WB-10 (September

---

[13] Regarding the authority of this document, Monks noted: "Because this memorandum (LCS) was read by many legislators and is part of the amendment's official drafting record, the conclusions in it should be considered a strong indicator of legislative intent." Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 280 (2001).

1998). Interestingly, in describing the points of view during the debate of the proposal, the LRB noted that proponents of the amendment asserted that case law from other states showed that the constitutional amendment would not hinder gun control. *Id.* at 4. Rather, it was opponents of the proposal that asserted that the measure would remove all reasonable regulation on guns. *Id.*

¶ 39. Our established constitutional analysis includes an examination of the practices in effect at the time the amendment was passed. Following the lead of the legislature, we have looked to the practices and interpretations of other states. Like proponents of the amendment, we are now convinced that the amendment does not affect the reasonable regulation of guns. The legislative history clearly suggests that the legislature did not intend to repeal reasonable gun laws such as the CCW statute. In examining the potential effects of the new right to bear arms, one article noted that the extensive 1995 LCS Memorandum reviewing the law of other states, lacked any reference to cases allowing prohibitions upon carrying a concealed weapon. McFadden, *Wisconsin Bear Arms Amendment,* 19 N. Ill. U. L. Rev. at 724–25. The article stated that although the 1995 LCS Memorandum concluded that prohibitions such as those restricting carrying concealed weapons have been found reasonable, it stated no case law to support the assertion. *Id.* at 725. While it is true that the 1995 LCS Memorandum dealt with case law analyzing other types of restrictions, we find LCS's examination of the general applicable standards to be correct and applicable to the CCW statute. Article I, Section 25 had potential implications on a wide variety of gun control laws, not just the CCW statute. The 1995 LCS Memorandum cites specifically to *People v. Blue,* 544

P.2d 385 (Colo. 1975); *People v. Brown,* 235 N.W. 245 (Mich. 1931); *Ricehill,* 415 N.W.2d 481 (N.D. 1987); *Comeau,* 448 N.W.2d 595 (Neb. 1989); and *Arnold,* 616 N.E.2d 163 (Ohio 1993). *See* 1995 LCS Memorandum at 7–11. These cases all conclude that "reasonable" restrictions upon the right to bear arms may be upheld. *See id.* As another article pointed out: "The principles involved in [right to bear arms] cases are often broad enough to transcend specific words." Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 286.

¶ 40. Further, as our discussion has made clear, our own review of relevant case law from other states shows that CCW statutes like ours have been upheld in states with constitutional protections similar to ours. *See Dano,* 802 P.2d 1021; *McAdams,* 714 P.2d 1236. Cole argues that this court should follow *Buckner,* 377 S.E.2d at 140, 144–145, where the West Virginia Supreme Court of Appeals concluded that a prohibition on carrying certain types of dangerous weapons without a license, violated the state's right to bear arms amendment. *Buckner* is distinguishable from the case at hand, because the statute at issue there was more broad in that it prohibited all carrying of a weapon, concealed or unconcealed, if one did not have a license. *See id.* at 144–45; *see also,* Monks, *The End of Gun Control,* 2001 Wis. L. Rev. at 286 (noting that *Buckner* involves "a type of statute that Wisconsin does not have"). Even in *Buckner,* however, the court maintained that the right to bear arms is not absolute and is subject to reasonable regulation. *Id.* at 145–46. We may well differ with the Supreme Court of Appeals in West Virginia as to the scope of "reasonable" regulation, but our analyses are similar.

¶ 41. In contrast to the holding in *Buckner,* a court of appeals in Ohio has recently affirmed the

validity of an Ohio prohibition on carrying concealed weapons. *See State v. Ferguson,* No. 14–02–14, 2003 WL 548360 (Ohio Ct. App. Feb. 27, 2003). In rejecting the defendant's claim that the concealed weapons statute was unconstitutional, the court noted that the Supreme Court of Ohio has upheld Ohio's CCW statute as constitutional. *Id.* at *2. The court, citing precedents of the Ohio Supreme Court, stated:

> The [CCW] statute does not operate as a prohibition against carrying weapons, but as a regulation of the manner of carrying them. This gist of the offense is the concealment. The constitution contains no prohibition against the legislature making such police regulations as may be necessary for the welfare of the public at large as to the manner in which arms shall be borne.

*Id.* (internal quotations omitted). We find this case to be more analogous than the *Buckner* case to the matter at hand. We are persuaded that the courts upholding concealed weapons statutes as reasonable restrictions upon a constitutional right to bear arms have properly balanced the interests of the individual and society. Also, given that our legislature was provided in-depth analysis of the general practices in other states, we conclude the legislative intent in creating Article I, Section 25 was not to repeal or invalidate existing gun control legislation, including Wis. Stat. § 941.23.

¶ 42. The final source this court is to consider in construing a constitutional amendment is the first related legislation passed after the amendment was ratified. In this case, the main statute of interest was passed long before the constitutional amendment was drafted. However, there is some legislative action that is of interest in our inquiry. As the amendment went through the drafting process to the present time, efforts have been made to pass laws creating a licensing system

for the carrying of concealed weapons. It has been proposed that Wis. Stat. § 941.23 be amended. 2001 S.B. 357; 2001 A.B. 675. However, such proposals have not yet been successfully passed into law. The attempts, though, suggest that the legislature believes the concealed weapons law is still intact. Were the right to bear arms intended to repeal the CCW statute, as Cole suggests, citizens would already have the right under the amendment to carry concealed weapons.

¶ 43. This court has not been forced to look far to find support for its conclusion that Wis. Stat. § 941.23 is facially valid. As our foregoing discussion makes clear, other states have shown a great willingness to uphold "reasonable" restrictions upon the constitutional right to bear arms. We believe the reason is the compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns. One article noted the prohibition of carrying concealed weapons is but one of a variety of laws restricting the place and manner in which arms may be carried, and concluded that such prohibitions "have little effect on widespread availability and ownership of weapons." Ridberg, *Impact of Right to Bear Arms Provisions*, 38 U. Chi. L. Rev. at 203–04. As such, the author concluded that it is unlikely that such laws would "frustrate the deterrence of oppression purpose." *Id.* at 204. The article noted that it may be argued, as Cole did here, that such laws impermissibly infringe upon the right of self-defense. However, there is a balance of interests that must be done, and in this situation, the public safety interests win out.

> [I]t might be argued that these laws impede the purpose of self-defense if they deny an individual the right to carry a weapon when he is most likely to be attacked. This argument is countered by two considerations: the

danger of widespread presence of weapons in public places and police protection against attack in these places. Thus, in view of the benefit to be derived from these laws, place and manner regulations which do not restrict possession in homes or businesses do not seem to subvert unduly the self-defense purpose.

*Id.* We agree with this analysis. Many other states have noted the important safety interests protected by gun control laws. As we have noted, courts have found such laws to be reasonable time, place, and manner restrictions upon constitutional rights to bear arms. The CCW statute in particular serves an important public safety purpose:

At common law or by very early statute in England, people were prohibited from going armed that they might not terrorize the King's subjects. That was never the law in this country, but from an early date, with the invention of small arms, statutes were enacted condemning the practice of carrying a deadly weapon concealed on or about the person. The reason for these statutes, it has been said, is "because persons becoming suddenly angered and having such a weapon in their pocket, would be likely to use it, which in their sober moments they would not have done, and which could not have been done had the weapon been upon their person."

*Williams v. Commonwealth*, 261 S.W.2d 807, 807–08 (Ky. 1953) (internal citations omitted). The Arizona Court of Appeals has noted similar reasoning: "[T]he statute has a reasonable purpose—it protects the public by preventing an individual from having on hand a deadly weapon of which the public is unaware, and which an individual may use in a sudden heat of passion." *Dano*, 802 P.2d at 1023. The passage of years has not eliminated these dangers. If anything, the

advances in weapons technology have made such dangers all the more prevalent.

¶ 44. Finally, we mention the intent of the Wisconsin voters. While this court cannot read the minds of Wisconsin citizens at the time they vote, since it is the voters that adopt the language of the constitution, indications of the will of the people are valuable. In the case of the right to bear arms amendment, public opinion polls at the time provide some interesting insights. Two statewide polls indicated that almost eighty percent of Wisconsinites opposed legalizing carrying of concealed weapons. Monks, *The End of Gun Control*, 2001 Wis. L. Rev. at 284. Given that the right to bear arms amendment was approved by a wide margin, the results of the poll at least support our view that Wis. Stat. § 941.23 and Article I, Section 25 were intended to be compatible. Such indications, in addition to a presumption of constitutionality, suffice to solidify our opinion that the CCW statute is facially constitutional.

## V

¶ 45. Cole has also claimed that the CCW statute is unconstitutional "as applied" to him. He claims that the statute impermissibly abrogates the right of an individual to bear arms while riding in a vehicle. This claim must fail.

¶ 46. First, we find that Cole has waived the opportunity to challenge the constitutionality of Wis. Stat. § 941.23 "as applied." In *State v. Trochinski*, 2002 WI 56, ¶ 34 n.15, 253 Wis. 2d 38, 644 N.W.2d 891, this court held that although a "facial" constitutional challenge was a matter of subject matter jurisdiction and

could not be waived, an "as applied" challenge was a non-jurisdictional defect that could be waived. There, the defendant waived an "as applied" constitutional challenge by pleading no contest. *Id.* Here, Cole pled guilty to all charges against him and did not raise any constitutional challenge until his motion for postconviction relief.

¶ 47. In addition, Cole argues a hypothetical rather than an application of the facts at hand. Generally, a person cannot challenge the constitutionality of a statute on the grounds that it may be unconstitutional as applied to others. *See State v. Thiel,* 183 Wis. 2d 505, 520, 515 N.W.2d 847 (1994) (citations omitted) (finding an exception to this general rule in the First Amendment context). Cole asserts that the CCW statute renders the right to bear arms useless in the context of transporting a weapon in a vehicle. He argues that, according to Wisconsin precedent, because weapons must be out of reach in the trunk and unloaded, a person is left with no meaningful way to exercise the right to bear arms for self-defense in that context. He asserts that such extensive restrictions act to deny a citizen any way to exercise the right to security and self-defense while riding in an automobile. However, such claims go far beyond the facts of this case. We see no need to examine the assortment of restrictions that may apply to transporting a weapon in a vehicle, because under the facts of this case, the constitutional right to bear arms has clearly not been infringed.

¶ 48. Cole claims that he was carrying the weapons because he had been "the victim of a brutal beating when he was younger and he did not feel safe in the neighborhood." (Pet'r Br. at 3.) He did not assert that he had the weapons in the car in response to any specific or

imminent threat. We do not dispute the legitimacy of Cole's reason for carrying the weapon. However interesting the debate about the right to self-defense by possession of a weapon in a vehicle may be, such concerns are not implicated by the facts of this case. In *State v. Nollie*, 2002 WI 4, 249 Wis. 2d 538, 638 N.W.2d 280, a case arising after the passage of the right to bear arms amendment, this court confirmed that a person may claim self-defense when charged under the CCW statute. *Id.*, ¶¶ 18–19, 24, 26. However, in that case, we found that the unsubstantiated threat of four young men nearby, being loud and profane in a "high crime" area, was not "imminent and specific enough" for the defendant to invoke self-defense. *Id.*, ¶¶ 23–25. The same problem arises in this case. Cole has presented no evidence of any threat at or near the time he was arrested.

¶ 49. In the case at hand, police seized two loaded weapons from the interior of a vehicle, one inside the glove compartment and the other stashed under the front seat of the vehicle. Both clearly were, by any definition, concealed. In *Dundon,* 226 Wis. 2d at 662, this court defined "concealed" as "hidden from ordinary observation," and noted that a weapon need not be completely hidden from view to be considered concealed. Whatever the outer reaches of application of the CCW statute might be in light of the new constitutional amendment, this fact scenario does not fall within them. The right to bear arms is clearly not rendered illusory by prohibiting an individual from keeping a loaded weapon hidden either in the glove compartment or under the front seat in a vehicle. The reasons supporting "facial" validity of the statute apply with equal force to the specific facts of this case. Public safety

concerns support reasonable restrictions. In *West Virginia Division of Natural Resources v. Cline,* 488 S.E.2d 376, 382–83 (W. Va. 1997), the Supreme Court of Appeals of West Virginia upheld a restriction on the transport of loaded weapons as a reasonable regulation of the manner in which weapons could be transported. There the court noted particularly the possibility of accidents. *Id.* Such dangers certainly support restrictions on loaded weapons. Cole had two loaded weapons within reach and completely hidden from the view of others. Under these specific circumstances, the CCW statute may be enforced without impeding the constitutional right to bear arms.[14]

## VI

¶ 50. Because we conclude that the CCW statute is a reasonable exercise of the state's inherent police powers, we find that the CCW statute is not unconstitutional either on its face or as applied to Cole.

*By the Court.*—The decision of the Milwaukee County Circuit Court is affirmed.

¶ 51. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I join Justice Prosser's concurrence except that part of his concurrence in which he states that he "strongly support[s] much of the majority opinion."[1] I have reservations about parts of the majority opinion.

---

[14] While Cole's "as applied" argument fails, we note that the scope of the application of the CCW statute has been appropriately raised in the companion to this case, also released today. *See State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785.

[1] Justice Prosser's concurrence, ¶ 60.

¶ 52. For example, it does not make sense to me that the majority opinion gives a statute that predates a constitutional amendment the presumption of constitutionality under the later-enacted constitutional amendment.[2] The presumption of constitutionality is based on the reasonable belief that a legislature intends to enact laws that are valid under the Constitution at the time they are enacted, not the unreasonable assumption that a legislature can anticipate all future constitutional amendments and draft constitutionally immortal statutes.

¶ 53. Furthermore, I am not persuaded that there is any difference between rational basis test and the majority opinion's "reasonable exercise of police power" test.[3] The exercise of police power must always be reasonable, that is reasonably and rationally related to a legitimate government interest.[4] The concealed weapons statute is constitutional if it represents a reasonable exercise of the State's police power and does not eviscerate the constitutional right to keep and bear arms.[5]

¶ 54. For the reasons set forth, I write separately.

¶ 55. N. PATRICK CROOKS, J. *(concurring)*. While I strongly disagree with the majority's conclusion that Wis. Stat. § 941.23 is constitutional, for the reasons set forth in my dissent in *State v. Hamdan,*

[2] *See* majority op., ¶¶ 12, 17.

[3] *See* majority op., ¶ 26.

[4] *See Noranda Exploration, Inc. v. Ostrom,* 113 Wis. 2d 612, 626, 335 N.W.2d 596 (1983).

[5] *See State v. Hamdan,* 2003 WI 113, ¶ 115, 264 Wis. 2d 433, 665 N.W.2d 785 (Abrahamson, C.J., dissenting), for further explanation of my views about the appropriate test to be applied.

2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785, I agree that Phillip Cole's conviction should be upheld. Because of Cole's waiver of the constitutional claim he now makes, I agree with the majority's mandate affirming Cole's conviction.

¶ 56. On May 12, 2000, Cole entered a plea of guilty to charges of carrying a concealed weapon (CCW) in violation of Wis. Stat. § 941.23 and to possession of THC (marijuana) in violation of Wis. Stat. § 961.41(3g)(e). Judge Maxine A. White sentenced Cole to 60 days on the CCW charge and 15 days (concurrent) on the possession charge.

¶ 57. Four and one-half months later, on September 29, 2000, Cole filed a motion to vacate his conviction on the CCW charge. For the first time he raised the issue of the constitutionality of the CCW statute, claiming that his right to bear arms, found in Article I, Section 25 of the Wisconsin Constitution, was violated by that statute.

¶ 58. He was too late! His objection was not made prior to his guilty plea, and therefore was not in any way preserved for subsequent review. Wisconsin law has long been clear that a guilty plea, which is knowingly and voluntarily made, waives all non-jurisdictional defects and defenses, including alleged violations of constitutional rights. *See State v. Bangert,* 131 Wis. 2d 246, 389 N.W.2d 12 (1986); *State v. Minniecheske,* 127 Wis. 2d 234, 378 N.W.2d 283 (1985); *State v. Damaske,* 212 Wis. 2d 169, 567 N.W.2d 905 (Ct. App. 1997), *review denied* 212 Wis. 2d 689, 569 N.W.2d 590.

¶ 59. Since Cole, by his guilty plea, waived his right to claim that Wis. Stat. § 941.23 (CCW statute) is unconstitutional, his conviction must be affirmed. Because of his waiver, I respectfully concur in the mandate.

¶ 60. DAVID T. PROSSER, J. *(concurring)*. This case represents the court's initial effort to interpret Article I, Section 25 of the Wisconsin Constitution. The majority opinion holds that the new provision grants a fundamental, individual right to keep and bear arms. The majority states several times that the right is "fundamental," majority op., ¶¶ 20, 26, 29, and it expresses agreement with the parties "that Article I, Section 25 . . . grants an individual, rather than a collective, right." *Id.*, ¶ 29. Although I strongly support much of the majority opinion, I write separately to explain why the amendment deserves a more nuanced interpretation.

¶ 61. Article I, Section 25 originated in the 1995 legislative session. The amendment was one of several reactions to municipal initiatives to ban handguns.[1] For instance, in April 1993 voters in Madison narrowly defeated an advisory referendum to ban handguns[2] championed by Madison Mayor Paul Soglin.[3] When the referendum failed, the Madison City Council began work on several ordinances that were more restrictive

---

[1] Christopher R. McFadden, *The Wisconsin Bear Arms Amendment and the Case Against an Absolute Prohibition on Carrying Concealed Weapons,* 19 N. Ill. U. L. Rev. 709, 713–16 (1999).

[2] James Rowen, *Madison Victory at Polls Bolsters Gun Supporters,* Mil. J., Apr. 8, 1993, at B5.

All cited newspaper clippings are from the state editions of Milwaukee newspapers on file at the Wisconsin Legislative Reference Bureau, Madison, Wisconsin.

[3] *Id.;* Daniel Bice, *Fendry Vows War on Gun Ordinances,* Mil. Sentinel, Dec. 8, 1994, at 6B.

on firearms than state law.[4] These ordinances were adopted by the Council on December 7, 1994.[5] Mayor Soglin cast the tie-breaking vote on two of the four ordinances.[6]

¶ 62. Milwaukee and Kenosha[7] placed gun control referenda on the November 1994 election ballot.[8] These referenda were not advisory; they were mandatory.[9] The Milwaukee referendum asked voters whether all handguns with barrels less than 10 inches should be banned in Milwaukee.[10] Commenting on the Milwaukee referendum, the *Los Angeles Times* reported that "no U.S. city has ever adopted such a strict gun-control measure. Chicago and Washington, D.C., outlaw the sale of handguns, but neither has tried to eliminate the hundreds of thousands of pistols residents already own."[11] The article went on:

[4] Joel Broadway, *City Officials Propose Ban on Assault Weapons,* Wis. State J., Apr. 19, 1994, at 1A; Joel Broadway, *City Council to Vote Tonight on Gun Control Proposals,* Wis. State J., Dec. 6, 1994, at 1A.

[5] Joel Broadway, *Gun Ban,* Wis. State J., Dec. 7, 1994, at 1A; Bice, *Fendry Vows War on Gun Ordinances,* Mil. Sentinel, Dec. 8, 1994, at 6B.

[6] *Id.*

[7] The Kenosha referendum question read: "Shall the possession of handguns be banned in the city subject to certain enumerated exceptions?" Tom Held, *Handgun Ban Shot Down,* Mil. Sentinel, Nov. 9, 1994, at 1A.

[8] Tom Held, *NRA Contributed $133,449 to Fight City Handgun Ban,* Mil. Sentinel, Nov. 1, 1994, at 1A.

[9] *Id.*

[10] *Id.*

[11] Stephen Braun, *Vote Puts Milwaukee Under the Gun,* Cap. Times, Nov. 2, 1994, at 3A. [reprinted from *Los Angeles Times* article].

Under the handgun ban proposal, nearly 300 federally licensed gun dealers (there are no gun shops in Milwaukee—most dealers sell out of their homes) would be restricted to selling only shotguns, rifles and the few pistols that have barrels longer than 10 inches.

Residents who own handguns would be urged to turn them over to city police, who would catalog and then destroy the weapons. When handguns turn up during arrests, traffic stops and other police contacts, residents could face misdemeanor convictions punishable by $100 fines and $200 for repeated convictions. All firearms would be confiscated.

Stephen Braun, *Vote Puts Milwaukee Under the Gun,* Cap. Times, Nov. 2, 1994, at 3A.

¶ 63. Both referenda were defeated.[12] However, the effect of the initiatives in Madison, Milwaukee, and Kenosha was to spur the newly elected legislature to consider legislation preempting local firearms ordinances that went beyond state law.[13]

¶ 64. Representative DuWayne Johnsrud announced that he would introduce legislation to preempt municipalities from enacting gun control ordinances that were stricter than state law. Representative Johnsrud stated: "Cities like Madison are creating a patchwork of regulations across the state. . . . I want to make sure that individuals have the law-given ability to

---

[12] Tom Held, *Handgun Ban Shot Down,* Mil. Sentinel, Nov. 9, 1994, at 1A.

[13] Jack Norman, *Pro-gun Forces Aim for State Ban on Bans,* Mil. J., Nov. 10, 1994, at B1; Daniel Bice, *Fendry Vows War on Gun Ordinances,* Mil. Sentinel, Dec. 8, 1994, at 6B; David Callender, *City's Gun Laws May Fall,* Cap. Times, Dec. 9. 1994, at 1A.

own a firearm if they feel it is necessary."[14] Johnsrud introduced 1995 Assembly Bill 69 on January 30, 1995. After intense controversy and debate, it became 1995 Wis. Act. 72 in November 1995. *Cf.* Wis. Stat. § 66.0409 (2001–02).

¶ 65. In the meantime, Senator David Zien introduced a constitutional amendment to keep and bear arms. 1995 Senate Joint Resolution 7 (introduced February 14, 1995). Senator Zien explained that the measure had been introduced because of "pressure on law-abiding gun-owning citizens" by "anti-gun forces."[15] "People from all over the state have come to me, concerned about attempts to limit their right to own a gun," Zien said in a statement.[16] He added that "law-abiding citizens" should not be forced to give up their "ability to defend" themselves, their families, and their property.[17]

¶ 66. On September 1, 1995, Assembly Majority Leader Scott R. Jensen introduced an identical constitutional amendment in the Assembly. 1995 Assembly Joint Resolution 53. More than half of the members of the Assembly co-authored Jensen's amendment, and they were joined by 16 senators. This was the joint resolution that ultimately passed.

¶ 67. The Zien/Jensen constitutional amendment, as originally proposed, read as follows:

> Every individual, except an individual restricted in accordance with federal law, has the right to keep and bear arms for any lawful purpose including for security

---

[14] *Gun Rule Shootout,* Cap. Times, Dec. 16, 1994, at 10A.

[15] Steve Walters, *Zien Seeks Guarantees on Ownership of Guns,* Mil. Sentinel, Jan. 20, 1995, at 4A.

[16] *Id.*

[17] *Id.*

or defense, for hunting and for recreational use, but the manner of bearing arms may be regulated as authorized by the legislature by law.

1995 Assembly Joint Resolution 53.

¶ 68. Representative Jensen's joint resolution was referred to the Assembly Committee on Elections and Constitutional Law, which conducted a public hearing on it only six days after its introduction.[18] On October 19, 1995, the Committee introduced two amendments to the resolution.[19] On November 29 the Committee adopted the two amendments and recommended the joint resolution for passage.[20] Incorporating the two amendments into the text, the proposed constitutional amendment at this point read: "Every individual has the right to keep and bear arms for any lawful purpose, including for security or defense, for hunting and recreational use."[21]

¶ 69. When the joint resolution came out of the Committee on Elections and Constitutional Law, it was referred to a second committee, the Assembly Committee on Criminal Justice and Corrections.[22] This was unusual. Normally a legislative proposal that has been recommended for passage and does not involve the expenditure of money is put on a calendar for debate. In this case, the Committee on Criminal Justice and Corrections received the resolution and held it until

[18] Assembly Bulletin of the Proceedings of the Wisconsin Legislature, 1995 A.J.R. 53, 1995–96 Sess., 394.

[19] *Id.*

[20] *Id.*

[21] *Id.;* Sharon Thelmer, *Gun Legislation Considered,* Wis. State J., Jan. 22, 1996, at 1A.

[22] Assembly Bulletin of the Proceedings of the Wisconsin Legislature, 1995 A.J.R. 53, 1995–96 Sess., 394.

February 15, 1996, when it was given a public hearing.[23] At this hearing, a representative of the Department of Justice, Andrew Cohn, testified against the amendment.[24] Cohn echoed the views of Attorney General James Doyle who had previously called the amendment "an extremely radical proposal."[25] Doyle alleged that the amendment as worded could nullify laws prohibiting concealed weapons and possession of machine guns and sawed-off shotguns.[26]

¶ 70. On March 22, 1996, the Committee on Criminal Justice and Corrections approved a substitute amendment,[27] which revised the proposed text of the constitutional amendment to read as follows: "The people have the right to keep and bear arms for security, defense, hunting, recreation and any other lawful purpose."

¶ 71. This text was approved by the Assembly on March 26, approved by the Senate on May 8, approved by the legislature at its next session, and ultimately ratified by the people of Wisconsin. During the first debate in the Assembly, the amendment was referred to as "the Soglin amendment."[28]

---

[23] *Id.*

[24] Record of Committee Proceedings: Public Hearing on A.J.R. 53 Before the Committee on Criminal Justice and Corrections, 1995–96 Leg. Sess. (Wis., Feb. 15, 1996) 1.

[25] Sharon Thelmer, *Gun Legislation Considered,* Wis. State J., Jan. 22, 1996, at 1A.

[26] *Id.*

[27] Assembly Bulletin of the Proceedings of the Wisconsin Legislature, 1995 A.J.R. 53, 1995–96 Sess., 394.

[28] Daniel Bice, *Assembly Backs Amendment Affirming Right to Own Guns,* Mil. J. Sentinel, Mar. 27, 1996, at 7B; Daniel Bice, *Assembly Supports Right to Bear Arms,* Wis. State J., Mar. 27, 1996, at 3B.

¶ 72. The majority opinion overlooks most of the historical background as well as the legislative dynamics in the amendment's approval. It confines discussion of the critical change in text to a footnote. Majority op., ¶ 29 n.10. In fact, for the proposition that the amendment "was intended to grant a 'fundamental individual' right," the majority opinion relies on a 1995 memorandum issued by the Legislative Council before *any* amendments to the Assembly Joint Resolution were introduced. Majority op., ¶ 20 (citing Shaun Haas, Senior Staff Attorney, Wis. Legislative Council, *Analysis of 1995 Assembly Joint Resolution 53 and 1995 Senate Joint Resolution 7, Relating to the right to Keep and Bear Arms (First Consideration) to Wisconsin State Representative David Travis and Interested Legislators,* at 6 (Oct. 11, 1995)). In reality, the various amendments altering 1995 Assembly Joint Resolution 53 appear to be a direct response to concerns raised in the Shaun Haas Legislative Council memorandum.

¶ 73. Footnote 10 of the majority opinion quotes from a 1997 Legislative Council Memorandum containing Shaun Haas's explanation of the textual change:

Assembly Substitute Amendment 1 substituted the phrase "The people" for the phrase "Every individual" in order to avoid a possible construction of the constitutional amendment that would preclude the Legislature, in the exercise of its inherent police power to enact laws that limit or infringe upon the right to keep and bear arms, from restricting the possession and use of arms by certain individuals (e.g., convicted felons) in the interest of protecting the health, safety or welfare of the public.

Majority op., ¶ 29 n.10 (quoting Memorandum from Shaun Haas, Senior Staff Attorney, *Explanation of 1997 Assembly Joint Resolution 11, Relating to the Right to*

*Keep and Bear Arms (Second Consideration) to Interested Legislators,* at 2 (January 22, 1997)).[29]

¶ 74. Having quoted this Legislative Council analysis, the majority opinion disregards its importance. If the change in constitutional text was intended to permit restriction of the possession and use of firearms by certain individuals—actually, substantial classifications of individuals—the amendment cannot be described as creating a "fundamental" right. Convicted felons are not the only persons restricted or prohibited from possessing or using firearms. *See* Wis. Stat. §§ 29.304, 941.29, 948.60(2). The same 1995 legislature that gave initial approval to the constitutional amendment also passed legislation prohibiting a person from possessing a firearm if he or she is subject to a domestic abuse, child abuse, or harassment injunction.[30]

¶ 75. In his law review comment on the right to bear arms amendment, Jeffrey Monks recognized and discussed the final change in constitutional text. He wrote:

> In right to bear arms amendments, the use of the phrase "the people" to describe those to whom the right has been conferred has sometimes been interpreted as indicating a collective rather than an individual right because "people" refers to an aggregate of citizens. Particularly because the Second Amendment, which is generally interpreted as granting a collective right, also uses the phrase "the people" in its language, one could

---

[29] Shaun Haas wrote the exact same words in a March 25, 1996, memorandum to Representative Robert G. Goetsch and other interested legislators, explaining Assembly Substitute Amendment 1.

[30] *See* 1995 Wis. Act 71; Wis. Stat. §§ 813.12, 813.122, 813.125.

argue this choice of language implies a similar interpretation for the Wisconsin amendment. Furthermore, the language of the proposed amendment originally included "every individual" and was changed to "the people" later. In a memorandum commenting on the amendment's original language, the [Legislative Council Staff] concluded that the purpose of the amendment was to create an individual right based partially on the fact that the term "individual" had been chosen. The fact that "individual" is no longer used undercuts this conclusion. If interpreted as a collective right, the amendment's effect as a limit on gun control legislation would be severely curtailed, as gun control laws are generally directed at individuals.

Jeffrey Monks, Comment, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 268. Curiously, the majority opinion does not report this passage. Instead, it quotes later passages that attempt to explain away any significance to the textual change. Majority op., ¶ 29 n.10 (quoting Monks, *supra,* at 268–69).

¶ 76. In retrospect, there are at least two reasons why the legislature changed the text of the proposed amendment from "Every individual" to "The people."

¶ 77. First, although the legislature wanted to establish a right that would benefit hundreds of thousands of individual gun owners, it wanted to deemphasize the "individual" nature of this right. The original amendment provided that "*Every individual, except an individual restricted in accordance with federal law,* has the right to keep and bear arms . . . but the manner of bearing arms may be regulated . . . ." (Emphasis added.) This draft could have been read to limit the police power to regulate firearms, permitting the legislature to regulate the *manner* of bearing arms but

denying it authority to restrict firearms ownership or possession, except "in accordance with federal law." By removing this limiting clutter from the draft, the legislature removed any impediment to a reasonable exercise of the police power. By shifting the right from "Every individual" to "The people," the amendment underlined the fact that the police power in Wisconsin may reasonably restrict specific individuals and classifications of people (*e.g.,* domestic abusers, minors) in ways that it may not restrict the people as a whole.[31]

¶ 78. Second, the legislature wanted to underscore that the people have a right to reasonably regulated gun ownership that cannot be denied to them en masse by state legislation or local ordinance.

¶ 79. The constitutional right to keep and bear arms in Wisconsin is an important right and a valuable right, and it must be protected. But it is not a fundamental right in the same sense that freedom of speech, freedom of worship, the right to remain silent, and the right to jury trial are *fundamental* rights. The right is subject to reasonable regulation under the police power. Recognizing the limits to this important right up front will avoid a deluge of frivolous litigation.

¶ 80. I am authorized to state that JUSTICE ANN WALSH BRADLEY joins this concurrence.

---

[31] Christopher McFadden correctly concluded that the amendment "evinces a hostility to inflexible, blanket gun control laws. While citizens may have agreed that less restrictive limitations on bearing arms were necessary and perhaps even desirable, they adamantly opposed total prohibitions." McFadden, *supra,* at 716.